No. 73,848

RODNEY MURPHY, *Appellee,* v. MICHAEL NELSON, Warden,
El Dorado Correctional Facility, *Appellant.*

(921 P.2d 1225)

 Opinion filed
July 26, 1996.

*Linden G. Appel*, deputy chief counsel, of Kansas Department of Corrections, argued the cause and was on the brief for appellant.

*Charles J. Cavenee*, of Legal Services for Prisoners, Inc., argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Michael Nelson, Warden, El Dorado Correctional Facility (respondent or Warden), appeals the trial court's rulings in this habeas corpus (K.S.A. 60-1501) proceeding that prison inmate Rodney Murphy must be immediately returned to the general prison population because he was being held in administrative segregation without legal authority and in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

This case focuses on prisoners' rights in view of the recent decision of the United States Supreme Court in *Sandin v. Conner*, 515 U.S. ___, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995), several recent cases from the Kansas Court of Appeals, and the Kansas Administrative Regulations applicable to prisoners.

*Factual Background*

On May 24, 1993, Murphy, then an inmate at the Lansing Correctional Facility, was placed in administrative segregation pursuant to K.A.R. 44-14-302(b), pending the results in an investigation of an inmate uprising 2 days earlier during which corrections officer Mark Avery was killed and another guard and prisoner severely injured. No presegregation hearing was held due to the "sensitive nature of investigation," as allowed by K.A.R. 44-14-303(c). The following day, Murphy appeared before the Administrative Segregation Review Board (ASRB or Board) which approved his segregation and furnished him with a copy of his initial segregation review that changed his status to "Other security risk" under K.A.R. 44-14-302(g).

The Board explained its decision in the following manner:

"Inmate was placed in segregation by shift supervisor after the inmate was alleged to be a participant in a disturbance on the maximum yard in which one officer was killed, one severely injured, and one inmate severely injured. The inmate's behavior constitutes a threat to the security and control of the institution. No pre-segregation placement hearing was conducted due to the serious nature of the emergency. The Board recommends that the inmate remain in segregation until the investigation of the incident is final and complete. The inmate stated that he had no knowledge of the incident."

Subsequent weekly and then monthly reviews of Murphy's segregation continued to recommend his segregation as the investigation into the incident continued and he became a suspect. After an October 4, 1993, incident in which Murphy attempted to disrupt the segregation unit, he was placed in a quiet cell and his status was changed pursuant to K.A.R. 44-14-307 to "Transfer to more restricted area." The following day, the ASRB recommended that Murphy be removed from the quiet cell, and his status was returned to "44-14-302(g) Other Security Risk." Murphy appeared before the Board personally on a number of occasions but, after November 30, 1993, refused to attend the review hearings.

The monthly review of January 4, 1994, contained the same language as the earlier reviews and, in addition, stated: "The inmate is a suspect in the death of Officer Avery and faces possible charges." On February 8, 1994, Murphy received a disciplinary report for possessing dangerous contraband. At no time did Murphy receive any official notice of who had accused him of participating in the Avery incident.

On March 4, 1994, Murphy filed a petition for a writ of habeas corpus pursuant to K.S.A. 60-1501, which is the subject of this appeal. In his petition he sought injunctive relief, alleging he was illegally restrained in administrative segregation without legal justification and in violation of the Fourteenth Amendment.

On April 18, 1994, a hearing was held on Murphy's petition. Evidence adduced established that Murphy was part of a large group of inmates who were treated similarly, although most had been transferred to El Dorado. No disciplinary proceedings had been initiated at this time in order to avoid jeopardizing the criminal cases. Some inmates who were initially segregated had been

released to the general population because the evidence against them was not as strong as that against Murphy.

The evidence against Murphy was said to be one inmate willing to swear that Murphy was involved in the assault on the slain correction's officer. Murphy was not then charged criminally for his involvement. At the time of the hearing, prison officials stated they intended to keep Murphy in segregation until the criminal trials were finished in hopes that information gained there would either confirm or deny his involvement.

Major Douglas Friesz, a member of the ASRB, testified he and other Board members were aware of the evidence involving Murphy's alleged role in the April 1993 incident. Friesz testified Murphy had not been given details of the evidence implicating him in order to reduce the possibility of violence or retaliation against the inmate informant.

As a result of this hearing, the trial court remanded the matter to the Lansing warden, David R. McKune, to reconsider Murphy's segregation and determine if there was a less restrictive way to accomplish the prison's goals. The trial court further ordered that if McKune decided to continue administrative segregation, he must present a detailed explanation of the rationale for his decision to the court in camera.

Both sides then filed written arguments with the court concerning the propriety of Murphy's segregation under established regulations and procedures and the extent of Murphy's due process rights. McKune presented his in camera evidence, the content of which is not in the record on appeal.

On February 23, 1995, the trial court filed its memorandum decision in which it noted that at that time Murphy had been in administrative segregation for nearly a year and a half and no criminal or disciplinary changes had been filed against him even though 12 others had been charged in connection with the murder of the corrections officer.

The trial court first held that by placing Murphy in administrative segregation McKune acted beyond his authority. The court reasoned that the regulation on which McKune relied, K.A.R. 44-14-302(g), permits administrative segregation only while the in-

mate is engaging in behavior threatening to the security or control of the prison. The court stated that while there was evidence that one inmate claimed Murphy participated in Avery's murder, there was no evidence Murphy was presently engaging in threatening behavior requiring his continued segregation.

Second, the trial court held the decision of the ASRB violated Murphy's procedural due process rights because it was based on no evidence whatsoever. The court reasoned that by withholding from Murphy the name of his accuser during the investigation of his involvement with the murder, and by failing to provide him with the details of his accuser's statement, he was prevented from having any meaningful hearing, which violated due process of law. In addition, the trial court faulted the failure to provide the Board with necessary information so it could make a meaningful decision as to the justification or lawfulness of retaining Murphy in administrative segregation.

Finally, the trial court stated: "If due process attaches for disciplinary cases that can result in segregation for 45 days, then it must attach to circumstances like this where the inmate may be segregated indefinitely."

The trial court ordered Murphy's immediate release from administrative segregation and return to the general population. The trial court granted respondent's motion for a stay pending the filing of a notice of appeal.

On August 4, 1994, while the case was proceeding in the trial court, Murphy was moved to the El Dorado Correctional Facility and continues to be held in administrative segregation there. Murphy filed a motion for substitution of parties, and we ordered the substitution of Michael Nelson, Warden of the El Dorado Correctional Facility, as the proper respondent herein.

On appeal, respondent essentially raises three principal questions: (1) Did the trial court err in ruling that Murphy was being held in administrative segregation illegally and without statutory or regulatory authority because K.A.R. 44-14-302(g), "Other security risks," requires a showing of present dangerousness or evidence that he is currently engaging in behavior that threatens the security or control of the prison? (2) Did the trial court err in holding that

K.A.R. 44-14-101 *et seq.* and 44-14-301 *et seq.*, dealing with administrative segregation, created liberty interests protected for prisoners by the Due Process Clause of the Fourteenth Amendment to the United States Constitution? (3) Did the trial court err in holding Murphy's due process rights were violated by the failure of the prison officials to inform him of the identity of the informant and the substance of the informant's statements implicating Murphy in the murder of Officer Avery and the aggravated assault of another corrections officer? In addition to these questions, we will address another question: Did the trial court fail to consider an issue raised by Murphy's petition which could be the basis for the relief he requested?

We answer each question affirmatively and consequently reverse the trial court. We remand for a determination of the underlying issue raised by the petition. Our analysis will set forth our scope of review, the background and statutory basis for the regulations in issue, and then discuss the issues in the same order as they were discussed in the trial court's decision.

*Scope of Review and Application of Regulations.*

All the issues on appeal concern questions of law upon which our review is unlimited. See *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). When determining a question of law, we are not bound by the decision of the trial court. *Memorial Hospital Ass'n., Inc. v. Knutson*, 239 Kan. 663, 668, 722 P.2d 1093 (1986). Additionally, *Jones v. Marquez*, 526 F. Supp. 871, 878 (D. Kan. 1981), clearly holds that the question of what process is due in a given factual situation is one of law.

It is clear that K.S.A. 1995 Supp. 75-5251 specifically authorizes the adoption of the rules and regulations by the Secretary of Corrections. Additional authority exists under K.S.A. 1995 Supp. 75-5205 and K.S.A. 1995 Supp. 75-5210 generally, and K.S.A. 1995 Supp. 75-5210(f) specifically states: "The secretary shall adopt rules and regulations for the maintenance of good order and discipline in the correctional institutions."

*Tew v. Topeka Police & Fire Civ. Serv. Comm'n*, 237 Kan. 96, 100, 697 P.2d 1279 (1985), summarized the application of an ad-

ministrative agency's rules and regulations by pointing out they must lie within the agency's competency to make and may not contravene or nullify controlling statutes, citing *Kansas Commission on Civil Rights v. City of Topeka Street Department*, 212 Kan. 398, Syl. ¶ 2, 511 P.2d 253, *cert. denied* 414 U.S. 1066 (1973). No question exists that the regulations in issue were properly issued.

*Tew*, 237 Kan. at 100, further teaches us that (1) regulations properly issued have the force and effect of laws, citing *Carpenter v. Johnson*, 231 Kan. 783, 789, 649 P.2d 400 (1982); (2) agency regulations are issued for the benefit of both the agency and the public and an agency must be held to the terms of its regulations, citing *United States v. 2,116 Boxes of Boned Beef*, 516 F. Supp. 321, 348 (D. Kan. 1981); and (3) as a general rule an administrative agency may not violate or ignore its own rules, and where it fails to follow the rules which it has promulgated, its orders are unlawful, again citing *Kansas Commission on Civil Rights*, 212 Kan. 398, Syl. ¶ 1.

In applying regulations, we do consider and grant considerable deference to an administrative agency's interpretation of its own regulations. See *Hickey v. Kansas Corporation Comm'n*, 244 Kan. 71, 76, 765 P.2d 1108 (1988). An agency's interpretation of its own regulation will not be disturbed unless the interpretation is clearly erroneous or inconsistent with the regulation. *In re Tax Appeal of Newton Country Club Co.*, 12 Kan. App. 2d 638, 647, 753 P.2d 304, *rev. denied* 243 Kan. 779 (1988). There is a strong presumption of regularity in administrative proceedings and actions. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 384, 673 P.2d 1126 (1983).

*Did the trial court err in ruling that Murphy was being held in administrative segregation illegally and without statutory or regulatory authority because K.A.R. 44-14-302(g), "Other security risks," requires a showing of present dangerousness or evidence that he is currently engaging in behavior that threatens the security or control of the prison?*

The effect of the trial court's ruling on this issue is that administrative segregation can continue only during the time an inmate's

actual behavior threatens the security and control of the prison. This conclusion of the trial court is based upon the wording of K.A.R. 44-14-302(g):

"Other security risk. The principal administrator may place in administrative segregation or lock-up, in the inmate's own cell, any inmate or group of inmates if the inmate or inmates are engaging in behavior which threatens the maintenance of security or control in the correctional facility. The principal administrator shall, in writing, explain, for the record, the threat to security and show justification for segregation or lock-up under these circumstances. A copy of the explanation and justification shall be sent immediately to the secretary of corrections."

Respondent argues the trial court's construction of this regulation is erroneous for two reasons. It is first contended that requiring the prisoner to be currently engaged in disruptive behavior in order to be held in administrative segregation is inconsistent with the regulatory scheme as a whole, which explicitly provides for special restrictions or discipline for segregated inmates whose conduct while in segregation continues to present a threat to the prison. See K.A.R. 44-14-307; K.A.R. 44-13-308. In this case, while in administrative segregation, such further measures were applied to Murphy during a period in which he was disruptive. If release from administrative segregation is mandatory when the inmate's actual present behavior is not a threat to the prison, the respondent contends these provisions for further sanctions are merely surplusage.

Second, respondent argues the trial court's construction of K.A.R. 44-14-302(g) is illogical and would create a revolving door policy which would require that as soon as an inmate becomes nondistruptive, he or she must be released even though he or she may immediately again cause disruption to the facility. We always strive for a reasonable interpretation or construction which avoids an unreasonable or absurd result. *State v. Roudybush*, 235 Kan. 834, 846, 686 P.2d 100 (1984).

K.A.R. 44-14-302(g), as part of a larger regulatory scheme, should not be read in isolation, but in light of the full regulatory plan of the agency relating to administrative segregation. The management of a potentially violent prison population could not be accomplished without constant danger to both staff and the inmate population if the prison must immediately release a prisoner from

administrative segregation as soon as the prisoner ceases his or her threatening behavior. This construction of the regulation adopted by the trial court is not justified. The trial court erred in stating the Warden's decision to hold Murphy in administrative segregation under K.A.R. 44-14-302(g) was outside of his grant of authority.

*Did the trial court err in holding that K.A.R. 44-14-101 et seq. and 44-14-301 et seq., dealing with administrative segregation, created liberty interests protected for prisoners by the Due Process Clause of the Fourteenth Amendment to the United States Constitution?*

In resolving this issue we must first dispose of Murphy's untenable arguments that since *Sandin v. Conner*, 515 U.S. 472, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995), was decided subsequent to the trail court's ruling herein, it may not be considered for the first time on appeal. This contention has absolutely no merit.

Supreme Court Rule 6.09(b) (1995 Kan. Ct. R. Annot. 35) clearly allows parties to rely on new authorities not previously cited, even after briefs have been filed. It is our general rule that a decided case is binding not only on those cases arising in the future, but also on those pending when the case is decided. *State v. Waterberry*, 248 Kan. 169, Syl. ¶ 1, 804 P.2d 1000 (1991).

Although our analysis will necessarily primarily involve *Sandin* and the cases cited therein, as well as applicable Kansas cases, it is essential to remember that the Fourteenth Amendment to the United States Constitution provides that no state can "deprive any person of life, liberty or property, without due process of law." Section 18 of the Kansas Constitution Bill of Rights provides that "[a]ll persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." Although this court could construe the rights granted to prisoners under the Kansas Constitution in a manner different than the United States Supreme Court does under the United States Constitution, traditionally, we have not done so.

The constitutional procedural due process analysis is a two-step procedure in which a court must first determine whether due process is involved and, if it is, the court must then determine the

nature and extent of the process which is due. In *Curtis Ambulance v. Shawnee Cty. Bd. of Cty. Com'rs*, 811 F.2d 1371, 1375 (10th Cir. 1987), the legal standard applicable to due process claims was described as follows:

"To prevail on its due process claim Curtis must prove that it had a definite liberty or property interest and that such interest was, under color of state law, abridged without appropriate process. *See Board of Regents v. Roth*, 408 U.S. 564, 569-70, 92 S. Ct. 2701, 2705, 33 L. Ed. 2d 548 (1972); *Casias v. City of Raton*, 738 F.2d 392, 394 (10th Cir. 1984); *Vinyard v. King*, 728 F.2d 428, 430 (10th Cir. 1984). The process requirement necessary to satisfy fourteenth amendment procedural due process comes into play only after plaintiff has shown that it has a property or liberty interest. *Vinyard*, 728 F.2d at 430 n.5 (citing *Roth*, 408 U.S. at 569-70, 92 S. Ct. at 2705). To establish a property interest in a particular benefit, one must have a 'legitimate claim of entitlement' to it. *Roth*, 408 U.S. at 577, 92 S. Ct. at 2709. '[A]n abstract need or desire for it' or a 'unilateral expectation' is insufficient. *Id.; see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S. Ct. 1148, 71 L. Ed 2d 265 (1982)."

These identical concepts were restated by Justice Lockett in *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 354, 770 P.2d 443 (1989), when he opined:

"When an interest involving life, liberty, or property is implicated, due process considerations apply. However, a protected due process right must encompass an interest recognized by the Constitution. *Harrison v. Long*, 241 Kan. 174, 178, 734 P.2d 1155 (1987) (citing *Sinclair v. Schroeder*, 225 Kan. 3, 8, 586 P.2d 683 [1978]). To prevail on their due process claim, appellants must show that they possess a definite liberty or property interest and that this interest was abridged, under color of state law, without appropriate process. See *Board of Regents v. Roth*, 408 U.S. 564, 569-79, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972).

"To establish a property interest in a particular benefit, appellant must have a 'legitimate claim of entitlement to it.' *Board of Regents v. Roth*, 408 U.S. at 577. A person's interest in a benefit becomes a property interest for due process purposes if there are 'rules or mutually explicit understandings' that support the claim of entitlement to the benefit and that the person may invoke at a hearing. *Perry v. Sindermann*, 408 U.S. 593, 601, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972). Without the existence of such rules or understandings, the person has only an abstract desire for or a unilateral expectation of the benefit. *Board of Regents v. Roth*, 408 U.S. at 577."

With it clear that due process violations can be established only if the claimant is able to establish that he or she was denied a specific procedural protection to which he or she is entitled, the

question of the procedural protection that must accompany a deprivation of a particular property right or liberty interest is resolved by a balancing test, weighing the individual loss at stake, the risk of erroneous deprivation, and the State's interest in the procedures used. See *Crane v. Mitchell County U.S.D. No. 273*, 232 Kan. 51, 57, 652 P.2d 205 (1982) (citing *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 [1976]).

The trial court found both that Murphy had a liberty interest in remaining in, and returning to the general prison population and that his due process rights were violated because he was not afforded the opportunity to know the identity of the informant against him in order to meaningfully participate in a hearing. Because we conclude no liberty interest exists in remaining in the general prison population as opposed to being placed in administrative segregation, the trial court also erred in holding the ASRB was required to inform Murphy of all of the existing evidence which might be used against him in a disciplinary proceeding or in a criminal prosecution.

The United States Supreme Court jurisprudence formalizing the area of prisoner due process claims has culminated in *Sandin*, which was decided June 19, 1995. Although *Sandin* arose out of an appeal from the procedure involved in imposition of disciplinary segregation in a Hawaii prison, its holding that Conner's discipline in segregated confinement did not present the type of atypical significant deprivation in which a State might conceivably create a liberty interest applies to confinement in administrative segregation, as in our case, because it was held in *Sandin* that at the time of Conner's punishment, "disciplinary segregation . . . mirrored those conditions imposed upon inmates in administrative segregation and protective custody." 132 L. Ed. 2d at 431.

The importance of *Sandin* is its pronouncement as to how a court determines whether an inmate has a protected liberty interest in some type or condition of confinement. The holding in *Sandin* represents a major departure from the rule of *Hewitt v. Helms*, 459 U.S. 460, 471-72, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983), which the *Sandin* opinion said had impermissibly shifted the focus of the liberty interest inquiry from one based on the nature of the

deprivation to one based on a micro-examination of the language of a particular state or federal regulation dealing with prisoners. In summarizing the procedure which has fallen into disfavor, the methodology of *Hewitt* was described as examining the regulations to see whether mandatory language and substantive predicates have created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's confinement conditions. The *Hewitt* test had encouraged prisoners to comb regulations in search of mandatory language on which to base claims of entitlement to privileges, created disincentives for states to codify prison management procedures in the interest of uniform treatment, and "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefits to anyone." *Sandin*, 132 L. Ed. 2d at 429.

We will not repeat the historical analysis of many of the prior United States Supreme Court cases involving prisoners' claims, which are well chronicled in *Sandin*. It is enough to note the *Sandin* Court did not overrule *Hewitt*, when it stated the following:

"Such abandonment of *Hewitt's* methodology does not technically require us to overrule any holding of this Court. The Court in *Wakinekona* and *Thompson* concluded no liberty interest was at stake. Although it did locate a liberty interest in *Hewitt*, it concluded that due process required no additional procedural guarantees for the inmate. As such, its answer to the anterior question of whether the inmate possessed a liberty interest at all was unnecessary to the disposition of the case. Our decision today only abandons an approach that in practice is difficult to administer and which produces anomalous results." 132 L. Ed. 2d at 249 n.5.

The author of the majority *Sandin* opinion, Chief Justice Rehnquist, approved the due process analysis of *Wolff v. McDonnell*, 418 U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974) (Due Process Clause does not create liberty interest in good time credits but statutory provision created a liberty interest in shortened prison sentence), and *Meachum v. Fano*, 427 U.S. 215, 228, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976) (no liberty interest in inmate intrastate prison transfers) and then went on to state:

"The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum*. Following *Wolff*, we

recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. See also *Board of Pardons v. Allen*, 482 U.S. 369, 96 L. Ed. 2d 303, 107 S. Ct. 2415 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, see, *e.g., Vitek*, 445 U.S. at 493, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (transfer to mental hospital) and *Washington*, 494 U.S. at 221-222, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 132 L. Ed. 2d at 429-30.

We believe the *Sandin* holding is clear that courts are no longer obligated to supervise or be involved in the day-to-day management of prison life:

"Admittedly, prisoners do not shed all constitutional rights at the prison gate, *Wolff*, 418 U.S. at 555, 41 L. Ed. 2d 935, 94 S. Ct. 2963, but ' "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." ' *Jones*, 433 U.S. at 125, 53 L. Ed. 2d 629, 97 S. Ct. 2532, quoting *Price v. Johnston*, 334 U.S. 266, 285, 92 L. Ed. 2d 1356, 68 S. Ct. 1049 (1948). Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." 132 L. Ed. 2d at 431.

It is no longer required that state regulations such as those involved in our case must be tested under *Hewitt*. *Sandin's* holding that discipline in segregated confinement did not present the type of atypical, significant deprivation by which a state might conceivably create a liberty interest requires that we hold that Murphy's confinement in administrative segregation is also not the type of significant deprivation by which the State of Kansas might create a liberty interest.

*Sandin* goes on to state, however, that

"[p]risoners such as Conner, of course, retain other protection from arbitrary state action even within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available." 132 L. Ed 2d at 432 n.11.

Although the trial court did not consider whether Murphy's confinement represented a significant and atypical hardship on the

prisoner, we do not believe, under the facts of this case, it was necessary for it to do so.

All of the applicable administrative regulations, including the minimum standards of segregation set forth in K.S.A. 44-14-101 which cover (a) diet, (b) cell conditions, (c) clothing and bedding, (d) communication with an attorney, (e) proper authority for segregation, (f) medical services, (g) log of essential facts, (h) weekly reports, (i) report of deprivations, (j) mail, (k) visitations, (l) telephone privileges, (m) legal materials, (n) reading materials, (o) exercise, (p) programs, and (q) daily administrative visitations are before us and fail to show the type of atypical significant deprivation by which the State of Kansas might conceivably have created a liberty interest.

It is clear that the administrative regulations in Kansas governing segregation compel a holding, as a matter of law, that administrative segregation does *not* represent a significant and atypical hardship on the prisoner in relation to the ordinary incidents of prison life.

In two pre-*Sandin* cases involving and applying the *Hewitt* analysis to the regulations concerned with administrative segregation in Kansas, two panels of the Court of Appeals reached opposite results. In *Gray v. Nelson,* 20 Kan. App. 2d 900, 893 P.2d 842 (1995), one panel held that repeated use of explicitly mandatory language in connection with requiring specific substantive predicates for administrative segregation created a liberty interest. In *Graham v. Nelson,* 20 Kan. App. 2d 896, 893 P.2d 294 (1995), another panel, relying on *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 104 L. Ed. 2d 506, 109 S. Ct. 1904 (1989), and *Dotson v. Maschner,* 764 F. Supp. 163 (D. Kan. 1991), found no mandatory language to limit discretion and require a particular result, which would give rise to a liberty interest.

The holding of *Gray* is disapproved, while the result in *Graham* is found to be consistent with our decision herein. Although *Graham* did not apply the current *Sandin* analysis, we concur with its result that no liberty interest exists in a prisoner's transfer to administrative segregation.

We will not, in this opinion, reach or discuss the Court of Appeals' decision in a third case involving the issue of whether there is a liberty interest in being free from segregation, *Davis v. Finney*, 21 Kan. App. 2d 547, Syl. ¶ 1, 902 P.2d 498 (1995), because *Davis* is a disciplinary segregation case. Any specific comment we would make would be inappropriate dicta.

*Did the trial court err in holding Murphy's due process rights were violated by the failure of the prison officials to inform him of the identity of the informant and the substance of the informant's statements implicating Murphy in the murder of Officer Avery and the aggravated assault of another corrections officer?*

Because we have held that no liberty interest exists in transfers to administrative segregation, the trial court's decision that Murphy's due process rights were violated by the failure of the prison officials to inform him of the identity of the informant and the substance of the informant's statement implicating Murphy is also erroneous.

*Did the trial court fail to consider an issue raised by Murphy's petition which could be the basis for the relief he requested?*

The central complaint in Murphy's habeas petition was that he continued to be held in administrative segregation for purely investigative reasons.

In the present case, it is undisputed that Murphy is being held as the result of his alleged involvement in an incident which occurred more than 3 years ago. Although Murphy has yet to be charged, others involved in the incident have even had their appeals resolved by this court. See, *e.g., State v. Harris*, 259 Kan. 689, 915 P.2d 758 (1996).

The statute of limitations on the May 22, 1993, incident at the Lansing Correctional Facility has now run on any offense, except for first-degree murder, for which Murphy might be charged. Yet, he remains uncharged, and the reason for his segregation, to determine if additional evidence against him would arise out the trials of those charged, no longer exists.

In establishing the regulations relating to administrative segregation in K.A.R. 44-14-301, the Secretary stated: "Administrative segregation procedures shall be established for the control of inmates for some necessary administrative purpose other than punishment."

With the reasons stated in the record as the "necessary administrative purpose" no longer in existence, a question arises whether continuing to hold Murphy in administrative segregation is for the prohibited reason of punishment.

We have no wish to have the court system involved in the day-to-day management of the prison system. See *Sandin*, 132 L. Ed. 2d at 429. We also continue to uphold the strong presumption of the validity of the administrative actions which take place within our correctional system.

However, based on the limited and restrictive facts of this case, we hold Murphy has the right to a K.S.A. 60-1501 hearing, with counsel, before the district court to challenge the presumption of regularity which has attached to the administrative segregation decision and attempt to establish that such segregation has actually become punishment contrary to K.A.R. 44-14-301. We remand this case for the limited purposes of such a hearing.

Reversed and remanded.