84,934

Michael Schmidt, *Appellant,* v. Kansas State Board of Technical Professions, *Appellee.*

(21 P.3d 542)

Opinion filed April 20, 2001.

*James D. Oliver,* of Foulston & Siefkin L.L.P., of Topeka, argued the cause, and *Caleb Stegall,* of the same firm, was with him on the briefs for appellant.

*Mark L. Bennett, Jr.,* of Mark L. Bennett, Jr. & Associates, of Topeka, argued the cause, and was on the brief for appellee.

The opinion of the court was delivered by:

WAHL, S.J.: Michael Schmidt, a licensed engineer, appeals the decision of the Shawnee County District Court affirming an order of the Kansas State Board of Technical Professions (the Board). The Board determined that certain construction drawings prepared by Schmidt constituted the practice of architecture as defined by K.S.A. 2000 Supp. 74-7003. The Board further held that Schmidt, unlicensed to practice architecture, was in violation of the regulations pertaining to professional conduct established by K.A.R. 66-6-4(e) (1995 Supp.) which regulations prohibit a licensee from affixing a signature, seal, or both, to a plan dealing with a subject matter outside the licensee's field of competence. The Board publicly censured Schmidt because he affixed his engineer's seal to documents dealing with the subject matter of architecture, an area which it held to be outside his field of competence as established by his education, training and licensing. The Board also required that he pay costs of $5,000, an amount the Board determined was a portion of the Board's investigative cost, expenses,

and attorneys fees in prosecuting the matter, and an amount equal to the statutory limit.

The salient facts of this case are, of necessity, very detailed. Michael Schmidt graduated from the University of Wyoming in 1974, with the degree of bachelor of science in civil engineering with an architectural engineering option. The university had no school of architecture, and he studied in the engineering school to obtain the architectural option. He completed some graduate work in systems management and then worked as an architectural engineer in the Air Force upon graduation.

The architectural engineering program involved courses in architectural design, architectural development or architectural history, architectural construction, and courses involving construction methods or specifications for estimating. He also took courses relating to electrical and mechanical systems. His work experience involved mechanical and electrical engineering as well as heating, ventilation, and air conditioning (HVAC) design. In addition, he received electrical design training while in the military. In 1999 Schmidt was licensed as an engineer in seven states.

Schmidt was licensed by the Board as a professional engineer in 1991. Schmidt's company, Schmidt Engineering Consultants, Inc., is located in Emporia, Kansas. Kansas issues licenses for professional engineers, but the licenses are not broken down by specialty such as electrical, civil, chemical, mechanical, or architectural engineering. Schmidt was licensed, in good standing, and had not been the subject of prior complaints when this action commenced.

On September 19, 1995, Dave Emig, a licensed architect who practices in Emporia, Kansas, and who has the only architectural firm in Emporia, filed a complaint with the Board alleging that Schmidt "prepared construction documents for Carlson Funeral Home and Kenyon Square Apartments" in Emporia. Emig complained:

"It is my opinion that Mr. Schmidt is practicing architecture. . . . In both of these projects, Mr. Schmidt's seal is on all drawings, including the architectural site plan, floor plan, wall and building sections, and construction details, indicating that Mr. Schmidt prepared documents for the entire project. Both of these pro-

jects are substantial new buildings, and the architectural portion of the project, in my opinion, is not incidental to the engineering required for the project."

On February 28, 1995, Schmidt had billed the corporation which built the Carlson Funeral Home for his work concerning the "[f]oundation design, preliminary site drainage planning, stormwater drainage calculations and submit[ing the] stormwater management plan to City Engineer, siz[ing] roof drainage piping, design[ing] mechanical room floor structure, electrical, plumbing, and HVAC, plans, plans review and seal[ing] plans for building permit." He subsequently also billed for revising the drawings and sealing the prints on March 31, 1995.

The Board brought a complaint on May 12, 1997, alleging that Schmidt "undertook to perform and performed work involving the practice of architecture and mechanical and electrical engineering, which he was not qualified to perform by education and experience when he prepared or supervised the preparation of . . . plans and specifications" and when he signed and sealed the plans for the projects. The Board alleged that Schmidt, in violation of K.A.R. 66-6-4, K.S.A. 74-7001, and K.S.A. 2000 Supp. 74-7026, performed work "involving the practice of architecture and mechanical and electrical engineering, which he was not qualified to perform by education and experience when he prepared or supervised the preparation of architectural, mechanical, electrical, and plumbing plans and specifications for the Carlson Funeral Home. . . ." The Board also alleged that Schmidt violated professional regulations when Schmidt prepared the architectural, mechanical, and electrical plans and specifications for the Kenyon Square Apartments in April 1995.

David Emig testified at the hearing before the Board. Emig was the first one to prepare some drawings for the Carlson Funeral Home project, and he had done some drawings in order to help the owners obtain a zoning variance. The Carlson Funeral Home was a custom-built, pre-engineered "Butler" building, and Emig's company prepared the preliminary plans in early 1995. Because Schmidt was not licensed as an architect, Emig complained to the Board after he saw Schmidt's drawings at an office in the city hall in Emporia.

Emig had reviewed the plans which had been sealed by Schmidt. He was asked if the preparation of the plans was within the definition of the practice of architecture as set out in K.S.A. 2000 Supp. 74-7003(d) and (e), but he could not offer an opinion. He did say that the drawings required the stamp and seal of an architect because the building was open to the public and the type of structure involved required the seal of an architect.

Emig also reviewed the apartment plans. He testified that the production of the site plan did not necessarily constitute the practice of architecture. The site grading and utility plan is often prepared by an engineer under an architect's direction, so that plan is not primarily architectural. He testified that the foundation floor plans are normally prepared under the supervision of an architect, and, in a complicated project, the foundation plan might be prepared by a structural engineer. Emig testified the exterior building elevation drawings are almost exclusively prepared by an architect. The enlarged floor plan indicating the layout of the rooms, which contained notes about handicapped accessibility, Emig believed almost always are exclusively prepared by architects. The building wall sections and foundation details are drawings normally prepared by architects, Emig stated. Emig testified the electrical power and lighting plans are typically prepared by mechanical engineers working under the supervision and coordination of an architect. The plumbing risers and plumbing layout are designs he ascribed to a mechanical engineer.

When asked to clarify his testimony concerning drawings which were usually prepared by an architect, Emig stated that the drawings he had referred to in that manner during his testimony were always, based upon his experience, prepared by an architect. Emig was not aware that another state entity, the Kansas Board of Education, allowed all of its plans to be signed by either an engineer or an architect.

Emig testified he believed Schmidt violated K.A.R. 66-6-4 (c), (d), and (e). However, he was not familiar with Schmidt's education and experience. Emig read the statute defining engineering, K.S.A. 2000 Supp. 74-7003(i), and did not interpret it to include the design of buildings and structures. He was asked why an architect

would have exclusive jurisdiction over certain designs, and he replied that the hearing itself was evidence of the need to have an architect prepare the drawings. Emig believed that the engineering definition referred to buildings and structures that were not occupied by the public such as railroad utility huts and utility sheds and that, to protect the public, an engineer without "the education and the training and licensing to perform architecture" cannot prepare and seal drawings. He admitted that his interpretation of the regulations and his experience with the regulations were no longer reflected in the current language of the regulations and statutes.

Various experts, both architects and engineers, testified before the board giving their opinions as to whether the work done by Schmidt constituted architecture or engineering, and there was no unanimity of opinion among them. They were, however, unanimous in not finding any fault with the plans developed by Schmidt. One architect, Charles Tryon, testified that the preparation of the plans for the projects in question constituted the rendering of services of performing creative work which requires architectural education, training, and experience. However, he testified that it is not uncommon for individuals within the field of civil engineering and the field of architecture to have expertise and education that might overlap in any given portion of a project. He stated that the extent of involvement of the professionals "depends on the project."

Schmidt was called to testify before the Board and testified that the plans were prepared by him or under his supervision. He designed or supervised the design of the mechanical and electrical systems. He designed the structure of the apartments, but the funeral home was a preengineered metal "Butler" building. The owners of the funeral home told Schmidt that they had consulted a funeral home consultant who had recommended a floor plan layout. He changed the plans in the sketch provided to him by the owners to ensure that the facility was in code compliance, and he then proceeded to prepare the plans.

Schmidt believed the building code requirements relating to the two projects "pertained to architectural engineering." Building code requirements allow either architectural or architectural en-

gineering seals and do not specify whether the code requirements are architectural or engineering. He would not concede that the projects involved "planning and providing preliminary studies and designs including overall interior and exterior building design" because in both projects, the preplanning and exterior appearance as well as the basic floor plans were developed by the owner and the owner's contractors and consultants.

Schmidt conceded that the projects might fall into the definition of the practice of architecture as it is defined in K.S.A. 2000 Supp. 74-7003(d) or (e) but insisted they could also fall into the definition of the practice of engineering as it is defined in K.S.A. 2000 Supp. 74-7003(i). When Schmidt designed and sealed the drawings for the projects, he believed he had the requisite licensing, education, training, and experience to perform the services. He has received no criticism of his work on the projects.

Schmidt testified that there was a 3-year period when he was primarily involved in the design of single family homes but that otherwise he had worked on commercial facilities.

Warren Ediger, an architect, testified on behalf of Schmidt. He had no complaints about the work in the drawings. He described the difficulty experienced, when working on small projects with a smaller fee, of employing a full complement of consultants from all disciplines. Ediger had consulted with Schmidt on code issues and found his insight helpful and sensitive to public health and safety. Schmidt had also provided structural engineering and mechanical and electrical engineering services to Ediger's clients. Based on his experience with Schmidt, Ediger believed Schmidt had experience which warranted classifying him as an architectural engineer.

Charles Bissey, a professor in the department of architectural, engineering, and construction science at Kansas State University, and an engineer, testified that Kansas State University has an architectural engineering program in which students engage in 4 years of engineering training and an additional year to include architecture courses in design work. Bissey testified that Schmidt's education was comparable to the program currently offered to students at K-State. Bissey testified that there is an area of overlap in

the statutes defining the professions. He testified that although there was testimony that the design of a wall section in the drawings is properly performed by an architect, alumni of the K-State program "are involved with these kinds of problems."

It was Professor Bissey's opinion that Schmidt had "enough architectural background to do the things he did." He testified it is common for clients to construct Butler buildings without architectural assistance.

The initial order issued by the Board determined that Schmidt was qualified to prepare some of the drawings because they constituted the practice of engineering but that he was not qualified to prepare other drawings because they constituted the practice of architecture. The Board publicly censured Schmidt and required him to pay the maximum statutory limit of $5,000, a portion of the Board's costs in the prosecution.

The Board denied Schmidt's petition for review pursuant to K.S.A. 2000 Supp. 77-527 and determined that the initial order would become the final order. Schmidt then filed a petition for judicial review in Shawnee County District Court on April 19, 1999. He alleged, relying upon the definition of the practice of engineering in K.S.A. 2000 Supp. 74-7003(i), that the Board failed to consider that his additional education in the field of architecture qualified him to do the architectural design on the two projects in question. He alleged that the Board's findings of fact were not supported by substantial competent evidence and that the Board erred in failing to consider the overlap of engineering with architecture.

The district court went further than the Board and determined that the engineering statute does not authorize the design and construction of buildings because it allows only the planning and design of engineering works and systems for buildings. The court stated it had little choice but to affirm the Board's decision because Schmidt was not licensed and qualified as defined by K.S.A. 2000 Supp. 74-7003 and K.A.R. 66-6-4. The district court concluded that the plain language of K.S.A. 2000 Supp. 74-7003(i) does not authorize design or construction of buildings. Finally, the district court noted that K.S.A. 2000 Supp. 74-7003(i) was amended in

1992 and that the amendment removed "any architectural aspect to the definition of the practice of engineering."

Schmidt's petition for review was denied on January 26, 2000, and Schmidt filed a notice of appeal on February 24, 2000.

Our standard of review is statutorily defined by the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* Under K.S.A. 77-621 (c)(4), a court may grant relief when the agency has erroneously interpreted or applied the law. Interpretation of statutory and regulatory provisions are questions of law over which the court has unlimited review. While giving deference to the Board's interpretation of the law, if it is interpreted or applied erroneously, the court is to take corrective action. *Burton v. Rockwell International*, 266 Kan. 1, 5, 967 P.2d 290 (1998). The district court determined that the engineering statute does not authorize the design and construction of buildings because it allows only the planning and design of engineering works and systems for buildings.

Because the primary issue in this appeal involves the interpretation of statutes and regulations, the rules of statutory construction set forth in *Todd v. Kelly*, 251 Kan. 512, 516, 837 P.2d 381(1992), apply. " ' "In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia*." ' " *Landry v. Graphic Technology, Inc.*, 268 Kan. 359, 365, 2 P.3d 758 (2000) (quoting *Todd*, 251 Kan. at 516).

Similarly, when interpreting administrative regulations, the courts generally will defer to an agency's interpretation of its own regulations. The agency's interpretation will not be disturbed unless it is clearly erroneous or inconsistent with the regulation. *Murphy v. Nelson*, 260 Kan. 589, 595, 921 P.2d 1225 (1996). However, the administrative agency may not use its power to issue regulations which alter the legislative act which is being administered. *In re Tax Appeal of Newton Country Club Co.*, 12 Kan. App. 2d 638, 647, 753 P.2d 304, *rev. denied* 243 Kan. 779 (1988).

The Board argues that great weight is to be afforded its construction of the statute because it is a statute which the Board is

designated to administer. The Board found that some of the drawings for the projects might be properly characterized as fitting within the practice of architecture. This finding might be afforded some deference because it is a conclusion within the Board's area of expertise. However, the Board determined that Schmidt was in violation of professional statutes because he sealed the drawings, a conclusion made without determining whether the drawings also constituted the practice of engineering. In doing so, the Board failed to consider the entirety of the professional licensing code and regulations. The Board made a determination of law over which the court has unlimited review. Whether the Board may refuse to address the statutory definition of the practice of engineering is a question of law. This court's review of a question of law is unlimited. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

Schmidt argues that the record establishes that he is a trained, educated, and experienced architectural engineer licensed to offer his services as a professional engineer and that the projects at issue can be performed by a professional engineer with the proper education, training, and experience. He notes that there is no evidence that the work was improperly done. Making note of the statutory definition of the practice of engineering, he argues that the record establishes that he practiced within the confines of his license and within his area of education, training, and experience.

Kansas statutes provide that the professions of engineering, land surveying, architecture, and landscape architecture are regulated by the Board. K.S.A. 2000 Supp. 74-7003. The definitions for the act read:

"As used in this act:

"(a) 'Technical professions' includes the professions of engineering, land surveying, architecture, landscape architecture and geology as the practice of such professions are defined in this act.

"(b) 'Board' means the state board of technical professions.

"(c) 'License' means a license to practice the technical professions granted under this act.

"(d) 'Architect' means a person whose practice consists of:

(1) Rendering services or performing creative work which requires architectural education, training and experience, including services and work such

as consultation, evaluation, planning, providing preliminary studies and designs, overall interior and exterior building design, the preparation of drawings, specifications and related documents, all in connection with the construction or erection of any private or public building, building project or integral part or parts of buildings or of any additions or alterations thereto, or other services and instruments of services related to architecture;

(2) representation in connection with contracts entered into between clients and others; and

(3) observing the construction, alteration and erection of buildings.

"(e) 'Practice of architecture' means the rendering of or offering to render certain services, as described in subsection (d), in connection with the *design and construction or alterations and additions of a building or buildings, the design and construction of items relating to building code requirements, as they pertain to architecture, and other building related features affecting the public's health, safety and welfare*; the preparation and certification of any architectural design features that are required on plats; and the teaching of architecture by a licensed architect in a college or university offering an approved architectural curriculum of four years or more.

. . . .

"(h) 'Professional engineer' means a person who is qualified to practice engineering by reason of special knowledge and use of the mathematical, physical and engineering sciences and the principles and methods of engineering analysis and design, acquired by engineering education and engineering experience, who is qualified as provided in this act to engage in the practice of engineering and who is licensed by the board.

"(i) 'Practice of engineering' means any service or *creative work,* the adequate performance of which requires engineering education, training and experience in the application of special knowledge of the mathematical, physical and engineering sciences to *such services or creative work* as consultation, investigation, evaluation, *planning and design of engineering works and systems,* the teaching of engineering by a licensed professional engineer in a college or university offering an approved engineering curriculum of four years or more, engineering surveys and studies, the observation of construction for the purpose of assuring compliance with drawings and specifications, representation in connection with contracts entered into between clients and others and the preparation and certification of any engineering design features that are required on plats; *any of which embraces such service or work,* either public or private, for any utilities, structures, *buildings,* machines, equipment, processes, work systems, projects and industrial or consumer products or equipment of a mechanical, electrical, hydraulic, pneumatic or thermal nature, insofar as they involve safeguarding life, health or property. As used in this subsection. 'engineering surveys' includes all survey activities required to support the sound conception, planning, design, construction, maintenance and operation of engineered projects, but excludes the surveying of real property for the establishment of land boundaries, rights-of-way, easements and the dependent

or independent surveys or resurveys of the public land survey system." (Emphasis added.)

The term "engineered projects" as used in the statute is not a defined term, but the definition of the practice of engineering includes service and creative work for utilities, structures, buildings, machines, and equipment. Most problematic is that the definition of the practice of engineering first includes a list of activities such as planning and design of "engineering works and systems" and then continues to define engineering practice as the service or creative work done for structures and buildings. No state courts have defined the term "engineering works and systems," and it is not defined in the statutes.

The statutory definition of architecture refers to design and construction of alterations and additions to buildings and design and construction relating to building code requirements as they pertain to architecture. The Board interpreted certain drawings for the projects to fit this definition and found this to be dispositive. The Board's analysis does not address the fact that its own regulations allow engineers to prepare and seal those documents that the engineer is qualified by education, training, and experience to seal, not merely those documents an engineer is licensed to seal.

The Board propounded regulations found in Article 66-6. K.A.R. 66-6-4 (1995 Supp.) provides:

"Rules of professional conduct.

"(a) For the purposes of this regulation, 'licensee' means any architect, landscape architect, land surveyor or professional engineer licensed by the board of technical professions.

. . . .

"(c) The licensee shall not advertise to perform or undertake to perform any assignment involving a specific technical profession unless licensed and qualified by education and experience in that technical profession, as defined in K.S.A. 74-7003.

"(d) Any licensee may accept an assignment requiring education or experience outside of the licensee's field of competence, but only to the extent that the services are restricted to those phases of the project in which the licensee is qualified. All other phases of that project shall be performed by licensed associates, licensed consultants, or employees who are otherwise qualified by virtue of their education or experience.

"(e) Except as provided in K.S.A. 74-7023(b), a licensee shall not affix a personal signature or seal or both to any plan or document dealing with subject matter which is outside of the licensee's field of competence by virtue of education or experience. Additionally, a licensee shall not affix a personal signature, seal or both to any plan or document except after completion of a detailed review and evaluation of the documents.

"(f) Where the competence of any licensee to perform an assignment in a specific technical field is at issue, the board may require the licensee to pass an appropriate examination."

## K.A.R. 66-6-1(b) (1999 Supp.) requires:

"Seal. (a) Each licensee shall obtain a seal of the design approved by the board in compliance with K.S.A. 74-7023, and amendments thereto. . . .

"(b) Each original drawing, document, technical report, legal description, record, and paper prepared by or under the direct supervision of the licensee in the licensee's professional capacity shall be stamped with the licensee's seal, unless the project is exempt from the requirements for licensure pursuant to K.S.A. 74-7031, K.S.A. 74-7032, K.S.A. 74-7033, or K.S.A. 74-7034, and amendments thereto."

On the one hand these regulations restrict a licensee to only the services to which they are licensed in subsection (c) but then, in subsection (d), permit the licensee to accept assignments and to perform "those phases of the project in which the licensee is qualified." In the next provision, the regulations indicate that a licensee may not seal "any plan or document dealing with the subject matter which is outside the licensee's field of competence by virtue of education or experience." The regulations specifically provide for licensees to draft outside their specialty if qualified by education and experience but do not require the licensee to obtain multiple specialty licenses.

Reading all of the provisions together, the Board's regulations allow an individual not specifically licensed to perform an assignment, to perform such aspects of the project that the licensee is nevertheless qualified to perform and to seal a plan or document—not if *licensed* to seal the plan or document, but if *qualified* to do so by virtue of education or experience. These regulations are consistent with the common construction and design practices described in the record.

Emig, the complaining architect, was unable to state that the preparation of the plans was within the definition of architecture but testified concerning his experiences in the traditional practice of architecture. Emig was also unfamiliar with Schmidt's education and experience. Emig admitted that his interpretation of the statute concerning the limitations to the practice of engineering was no longer supported by the current language of the statute and the regulations.

The testimony indicated that the owners building the projects had preconceived plans and had consulted with other planners before taking a design and photographs to Schmidt. No one offered any criticism of the quality of Schmidt's work. It was agreed by professional witnesses that it was common for the technical professions to overlap in design and planning. The construction of the Butler building did not require the services of an architect. No one testified that there was an accepted definition which clearly distinguished the practice of architecture from the practice of engineering. Professor Bissey testified that Schmidt possessed the architectural background through education, training, and experience to perform the work on the projects.

Whether a licensed engineer can prepare plans for the design of buildings is an issue of first impression in Kansas. The Board concluded that Schmidt was in violation of K.S.A. 2000 Supp. 74-7026, prohibiting the unlicensed preparation of aesthetic building plans, because he is not licensed as an architect. The Board's decision fails to take into account the fact that its own regulations provide that plans can be sealed by an engineer qualified by education and experience. K.A.R. 66-6-4(d) (1995 Supp.). Rules and regulations adopted by an administrative board to carry out a policy declared by the legislature have the force and effect of law. *Kansas Public Service Corp. v. State Corp. Comm'n,* 199 Kan. 736, 743, 433 P.2d 572 (1967).

Some jurisdictions have determined that a licensed professional engineer must also have an architectural license when he or she performs work that might lawfully be done by an architect, but only when the functions he or she has performed are outside the scope of his or her engineering license. See Annot., 82 A.L.R. 2d

1004, 1018-19. Other jurisdictions have concluded that when a licensed professional is performing services

"which could properly be regarded as within the reach of both the statutes governing the licensing of the two professions, the architect or engineer is considered to perform under the statute under which he or she was licensed and is not affected by the fact that the services came incidentally within the purview of the other licensing statute." 5 Am.Jur.2d, Architects, § 3, p. 628.

In *Lehmann v. Dalis,* 119 Cal. App. 2d 152, 154, 259 P.2d 727 (1953), the court concluded that the architect licensing statute was of no significance in ascertaining the nature and scope of the work an engineer is authorized to perform as a licensed engineer.

In *Verich v. Florida State Board of Architecture,* 239 So. 2d 29, 31-32 (Fla. App. 1970), the court mused that judicial ratification of the traditional line of reasoning concerning the division of the professions would help to establish a clear legal line of demarcation between architecture and engineering. The court noted, however, that such a restriction or limitation upon a duly licensed professional must he found in the statute and cannot be based solely upon a historical preference or understanding. 239 So. 2d at 31-32.

The Pennsylvania court in *Rosen v. Bureau of Professional Affairs,* 763 A.2d 962 (Pa. Commw. 2000), faced a similar problem. The owner hired a drafting company to survey a building for renovation. The drafting company hired a professional engineering firm to seal the documents to obtain renovation permits. The experts before the professional licensing board testified that the project at issue was both architectural and engineering in nature. The Pennsylvania code excluded from the definition of the practice of architecture the practice of engineering except as such engineering work is incidental to the practice of architecture. The Pennsylvania code also exempted architectural work which was incidental to engineering from the definition of the practice of engineering . Acknowledging "an ongoing turf war between these two learned professions over the application of their professional disciplines to the design of buildings," the court focused on the purpose of the statutes—to protect the public. 763 A.2d at 965.

The Pennsylvania court determined that the two statutes should be read *in pari materia*. Because the matter involved the area of overlap of the two professions, the architects board was not entitled to a great deal of deference, the court concluded. 763 A.2d at 968. The Pennsylvania court criticized the architects board for failing to analyze whether the engineer's work was lawfully encompassed within the practice of engineering. The practice of engineering, the court determined, permitted engineers to design buildings and the fact that the "practice of architecture encompasses the same activities does not diminish the sphere of the practice of engineering." 763 A.2d at 969.

By failing to determine whether Schmidt was qualified to prepare the plans as an engineer, the Board used K.S.A. 2000 Supp. 74-7026 to prevent the practice of another legally recognized profession—engineering. A licensing statute should not be applied in a manner that would prevent the practice of any other legally recognized profession. Although the Kansas statute defining the practice of engineering does not have an exception for work incidental to the practice of engineering, there was nothing illegal about the work Schmidt performed as an engineer; hence, it was improper for the Board to censure him. In addition, the Board was obligated to consider its own regulations. An agency may not disregard its own rules and regulations, and where it fails to follow the rules which it has promulgated, its orders are unlawful. *Gilmore v. McKune*, 23 Kan. App. 2d 1029, Syl. ¶ 4, 940 P.2d 78 (1997).

The Board gives great weight to a statutory amendment in 1992 which eliminated an exception that had been contained in K.S.A. 74-7003(i) to allow an engineer to perform services if such services were incidental to the practice of engineering. See L. 1992, Ch. 240. Whether the exception exists is quite irrelevant without the legislative history indicating the purpose of the legislature in eliminating the exception. The Board offers no support for its argument that the legislature intended that each occupational license should be mutually exclusive.

Schmidt argues that because K.S.A. 74-7001 *et seq.* impose a civil penalty, they must be strictly construed against the State.

Whether the statutes should be strictly construed is not critical in light of the Board's failure to apply the law properly.

The Board's decision does not address the meaning of the statute defining the practice of engineering. As such it is incomplete. The trial court further restricted the practice of engineering by holding that the statute defining engineering limited the profession to the planning and design of engineering works and systems for buildings. These decisions are inconsistent with the Board's own regulations which allow an engineer to seal those drawings he is qualified by education, training, and experience to prepare. By failing to consider the overlap in the professions, the Board and the district court incorrectly concluded that Schmidt's actions warranted censure, and his professional practice was improperly restricted.

Reversed.