No. 38,564

JESSE HOMER BRADLEY and CLEO M. BRADLEY, *Appellees,* v. FRED C. MINOR and REBECCA R. MINOR, *Appellants.*

(245 P. 2d 1206)

Opinion filed July 3, 1952.

*W. L. Cunningham* and *D. Arthur Walker,* both of Arkansas City, argued the cause, and *Wm. E. Cunningham* and *William R. Howard,* both of Arkansas City, were with them on the briefs for the appellants.

*Harry O. Janicke,* of Winfield, argued the cause, and *J. A. Herlocker,* of Winfield, was with him on the briefs for the appellees.

The opinion of the court was delivered by

PRICE, J.: This was an action for the specific performance of a written contract for the sale of a farm and for an accounting of rents and profits because of the alleged wrongful refusal of defendants to convey the property and to surrender possession according to the terms of the contract. Judgment was for plaintiffs, and defendants appeal.

Defendants assign twenty-one specifications of error, among them being the overruling of their demurrer to plaintiffs' evidence, and in our disposition of the appeal we confine ourselves to the propriety of that ruling.

The facts, and concerning which there is no dispute, as disclosed by plaintiffs' evidence, are very simple. Defendants were the owners of and lived on a 320-acre farm in Cowley county. Plaintiffs were desirous of purchasing a farm in that locality, but in order

to do so it was necessary for them to borrow the full purchase price from an agency of the Federal government. Pursuant to negotiations and an investigation they were approved for a government loan. In the summer of 1946 they contacted defendants concerning the purchase of the latters' farm of 320 acres. It developed that plaintiffs could not obtain a government loan sufficient to buy that much acreage. Later the parties orally agreed to the purchase and sale of 240 acres at $43 per acre, making a total purchase price of $10,320. They later met at the government loan office in Winfield for the purpose of executing an option to purchase for which plaintiffs paid defendants the sum of one dollar. Because of circumstances, not here material, the office secretary did not prepare the option on this occasion, but it was understood she would do so later and mail it to defendants for their signatures. This was done, and the option so prepared and mailed listed the selling price as $10,320.

When defendants examined this option, which was on a prepared government form, they noticed that it provided that they, as vendors, were required to obtain and pay for title insurance. They objected to this requirement and so advised plaintiffs. In the meantime the matter had been taken up with the local government loan agent and he estimated the title insurance would cost $60. Plaintiffs, as purchasers, agreed to pay the amount themselves but were advised by the loan agent that they could not do so under the government contract and that it would be necessary to raise the option in the amount of $60 so as to cover the charge. Apparently this arrangement was satisfactory to defendants as their chief concern was to receive the sum of $10,320 net for the 240 acres.

Pursusant to this arrangement a new option agreement was prepared and was signed by defendants on September 12, 1946. It listed the purchase price of the property as $10,380, and by its terms defendants agreed to deliver, without charge to plaintiffs, a policy of mortgage title insurance in favor of the government in the amount of the purchase price of the property. This option was irrevocable for a period of sixty-one days from the date of its execution, and on October 31, 1946, plaintiffs accepted the same in writing and delivered such acceptance to defendants on November 4, 1946, which date was within the period of the option. In the written application for title insurance, which was signed by one of the defendants on September 19, 1946, the sale price of the farm was

listed as $10,320. On November 13, 1946, defendants delivered to plaintiffs a written notice of termination of the option, which under its terms they were permitted to do. In the meantime plaintiffs' loan application went through, government money was made available to them and they at all times stood ready, willing and able to complete their end of the deal. Defendants refused to convey—hence this lawsuit.

Defendants rely upon a number of defenses in order to justify their refusal to carry out the contract, but in our view of this case only one need be mentioned and discussed. That defense is that by the "boosting" of the purchase price in the amount of $60, so as to take care of the premium for title insurance, a fraud was perpetrated upon the government, and that it amounted to a "side agreement" in violation of law and federal rules and regulations, thus making the contract contrary to public policy, void and unenforceable.

At the trial it was stipulated that certain federal laws and regulations were in effect during the period covered by the negotiations in question. These will not be set out, but it is sufficient to say that they prohibited false representations of any nature, concealment, side agreements and the like, and provided for the infliction of penalties, such as fine and/or imprisonment, for violation thereof. One of the government regulations provided in part:

"The full purchase price of all farms purchased in connection with this program must be named in the option between prospective borrowers and their vendors. Side agreements between prospective borrowers and their vendors upon a purchase price greater or less than the option price shall not be permitted."

In other words, we have this situation: Defendants agreed to sell the 240 acres for $43 per acre, making a total sum of $10,320. When they learned that the option agreement would require them to furnish title insurance costing approximately $60, they refused to sign. Later, at the suggestion of the government loan agent, a second option agreement was prepared which raised the sale price to $10,380, it being understood that the additional $60 would be used to pay for such title insurance. Defendants executed this agreement, but when they learned of the hazard to which they were subjecting themselves, refused to carry out the agreement. This option agreement contained the provision that:

". . . the purchase price. herein stated represents the entire consideration for the sale of the farm. Any side agreement between the Seller and the Buyer for the payment of a greater or lesser sum shall be void and unenforceable."

The question, then, is: Did the negotiations and dealings between the parties, disclosed by plaintiff's evidence, constitute a "side agreement" or other acts prohibited by law?

We think there can be but one answer, and that is that they did.

By the express terms of the option agreement defendants were to deliver, without charge to plaintiffs, a policy of mortgage title insurance in favor of the government. The agreement itself was to list the true purchase price. Plaintiffs argue there was no fraud or concealment as the agreement showed the purchase price to be the higher amount, $10,380, which sum was actually to be paid to defendants. The only trouble with that argument is that in truth and in fact such higher amount was not the actual purchase price. Defendants were to receive a net amount $60 less than that figure, under any theory. The effect of the side agreement was that the government, in the first instance, would be paying the cost of the insurance, and ultimately would be reimbursed by plaintiffs as they paid off the loan. The sum and substance, therefore, of the whole matter is that the option contract, being the result of the side agreement, was in direct contravention of law and unenforceable under the universal rule to the effect that no action can be maintained, either at law or in equity, upon any contract or agreement made in violation of law. (*Bourbon County Comm'rs v. Miller*, 132 Kan. 52, 294 Pac. 863; *Cook v. Donner*, 145 Kan. 674, 66 P. 2d 587, 110 A. L. R. 244; *Roddy v. Hill Packing Co.*, 156 Kan. 706, 715, 137 P. 2d 215; *Murphy v. Plains State Bank*, 157 Kan. 530, 142 P. 2d 733; and *Brumm v. Goodman*, 164 Kan. 281, 188 P. 2d 913.)

In view of our holding it is unnecessary to discuss numerous other contentions made by the parties in support of or to overthrow the judgment rendered. The judgment of the lower court is therefore reversed with directions to sustain the demurrer to plaintiffs' evidence.