## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

**FILED**

**July 2, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

**LINDA McDADE and GARY GROOMS,)**

    Plaintiffs/Appellants,       )    Obion Circuit No. 9904

**v.**

                 )    Appeal No. 02A01-9805-CV-00124

**R. HENRY IVEY,**

    Defendant/Appellee.     )


### APPEAL FROM THE CIRCUIT COURT OF OBION COUNTY
### AT UNION CITY, TENNESSEE


### THE HONORABLE LEE MOORE, JUDGE


For the Plaintiffs/Appellants:

Donald D. Glenn
Jackson, Tennessee

For the Defendant/Appellee:

James M. Glasgow
Union City, Tennessee


**AFFIRMED**


HOLLY KIRBY LILLARD, J.


CONCUR:

W. FRANK CRAWFORD, P.J., W.S.


ALAN E. HIGHERS, J.

OPINION

This is a breach of contract case. The plaintiffs and the defendant orally agreed to each submit applications to the Federal Communications Commission ("FCC") to obtain a license to construct and maintain cellular phone operations. The parties agreed to share the profits if any one of them was awarded a license. The defendant was awarded a license, and the plaintiffs sued to enforce the agreement. The trial court granted summary judgment to the defendant finding the contract was illegal under FCC rules and therefore unenforceable. The plaintiffs appeal. We affirm.

In the 1980's, the FCC established a lottery system under which applicants were randomly chosen by the FCC to receive licenses to build and maintain cellular phone operations. The FCC promulgated regulations to aid in the licensing process for Rural Service Areas in the United States. In 1986, the FCC issued a notice of a proposed amendment to the regulations governing the Rural Service Areas to prohibit "partial settlements" among applicants. Amendment of the Commission's Rules for Rural Cellular Service, 1 F.C.C. Rcd. 499 (1986). In 1988, the amendment was adopted. *See* 47 C.F.R. § 22.33(b)(2) (1988). The FCC defined a partial settlement among applicants as "any arrangement among fewer than all of the applicants in a market that provides any reciprocal interests in the applications of the parties to the arrangement." 4 F.C.C. Rcd. 2440, n.2 (1988).

In 1987, Defendant/Appellee Henry Ivey ("Ivey") approached Plaintiff/Appellant Gary Grooms ("Grooms") and Max McDade ("McDade"), husband of Plaintiff/Appellant Linda McDade ("Linda McDade"), concerning potential participation in the lottery conducted by the FCC. The parties, including Karl Ivey, son of Henry Ivey, orally agreed that each of them would submit a separate application to the FCC to obtain a license for cellular operations. The parties agreed they would share equally in any profits received if any one of the applications was successful. McDade did not submit an application, apparently because he had been convicted of a felony in the past. McDade's wife, Linda McDade, submitted an application in her name. The record indicates that all of the parties admitted the existence of the agreement as well as its terms.

Subsequently, the FCC regulations were amended to prohibit partial settlements, pursuant to the notice of the proposed amendment published in 1986. *See* 47 C.F.R. § 22.33 (b)(2) (1988).

The parties nevertheless continued the agreement to split the proceeds if one of the parties to the agreement was awarded a license.[1]

Henry Ivey, Linda McDade, Grooms and Karl Ivey each submitted a "cellular application services agreement" to Romulus Engineering ("Romulus"), which was engaged in the business of preparing such applications. Each of the parties provided the technical information required by the FCC to obtain construction licenses for cellular operations, and submitted an application fee of approximately $9,000 to Romulus. Romulus placed applicants in investor groups or partnerships and submitted applications on behalf of each group. Henry Ivey, Linda McDade, Grooms and Karl Ivey were placed in different investment groups or partnerships.

Linda McDade's partnership, "Silver Wings," won a rural service area but was disqualified because an alien was a partner. The disqualification resulted in Silver Wings Partnership filing a lawsuit against Romulus. Silver Wings Partnership agreed to a settlement of the lawsuit against Romulus, and Linda McDade received approximately $30,000. Prior to the disqualification and subsequent settlement, the McDades paid expenses incurred by the Silver Wings partnership. In December 1994, Grooms received approximately $6,000 from the proceeds of the Silver Wings settlement with Romulus after the McDades deducted expenses. Karl Ivey and Grooms' partnerships were unsuccessful in obtaining a construction license. Henry Ivey's partnership was awarded a construction license.

At a point in time disputed by the parties, Henry Ivey refused to accept any of the proceeds from the Silver Wings settlement. Eventually, Ivey sold the construction license receiving $742,000 from the sale. Ivey refused to share with Grooms and McDade the proceeds from the sale of the construction license. Ivey informed Grooms and Max McDade separately that the agreement was "illegal" under FCC rules.

Linda McDade and Grooms then filed this action seeking a share of the proceeds from the sale of Ivey's interest in the license. Ivey filed a motion for summary judgment. The trial court granted Ivey's motion for summary judgment. In its order, the trial court found that the agreement among the parties was "illegal under FCC rules;" and that it would therefore be "contrary to public

---

[1]The trial court noted in its opinion that FCC regulations at that time required an applicant for a license to amend the application to disclose violation of any FCC regulations within thirty days. The trial court observed that the parties never amended their application.

policy to enforce such an agreement." In addition, the trial court found that the FCC's process of granting construction licenses for cellular operations involved a lottery which was illegal under Article 11, Section 5 of the Tennessee Constitution, which prohibits participation in a lottery. The trial court concluded that the agreement among the parties was void and unenforceable. From this order, Linda McDade and Grooms now appeal.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* at 210-11. Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Id.* Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Id.*

Linda McDade and Grooms contend that the trial court erred in finding that the agreement among the parties was "illegal under FCC rules." In addition, they argue that the FCC has refused to set out a penalty for the violation of 47 C.F.R. § 22.33(b)(2), citing *In re Algreg Cellular Engineering, et. al.*, 12 F.C.C. Rcd. 8148 (1997), and, as a result, the agreement is not illegal and should be enforced. They also argue that the agreement among the parties does not involve a lottery that is illegal under the Tennessee Constitution.

As noted above, the FCC regulations expressly prohibits partial settlements, defined as "any arrangement among fewer than all of the applicants in a market that provides any reciprocal interests in the applications of the parties to the arrangement." 4 F.C.C. Rcd. 2440, n.2 (1988). When the amendment prohibiting partial settlements was being considered, the FCC explained its reasoning in the notice of proposed rule-making:

> We are concerned that by permitting such partial settlements we have encouraged speculative filings by insincere applicants, and that the resulting large number of applications and settlements has squandered Commission time and resources,

3

delayed cellular processing and slowed cellular service to the public, without providing a countervailing administrative or public benefit.

1 F.C.C. Rcd 499 (1986). The regulations do not specify the penalty for submitting an application that is subject to a partial settlement.

In *Algreg*, cited by plaintiffs, the applicants entered into an agreement under which the applicant who won the license would receive 50% and the other parties to the agreement would receive 50% of "distributed income proceeds." *In re Algreg Cellular Engineering, et. al.*, 12 F.C.C. Rcd. at n.4. In addition, the signatories to the agreement who were not awarded a license would receive up to 50% of any proceeds derived from the sale of the cellular system. *Id.* at n.35. The FCC found that this agreement was a partial settlement that violated § 22.33(b)(2). *Id.* at n.45. The Commission failed to set out a specific penalty, but recognized that all of the parties to the agreement except for one had rescinded the contract. *Id.* at n.48. The FCC required the remaining party to rescind the contract. *Id.*

In the case at bar, the parties entered into an oral contract whereby the parties agreed that they would submit separate applications to the FCC. The parties agreed that, if any party won a license from the FCC, all parties to the agreement would divide the profits. The arrangement among the parties in this case clearly constitutes a partial settlement in violation of 47 C.F.R. § 22.33(b)(2). This holding by the trial court is affirmed. The issue then becomes whether a contract which violates FCC rules merely voids the application for a license or whether the contract is unenforceable in a court of law.

The Kansas Supreme Court addressed a similar issue in *Bradley v. Minor*, in which private parties entered into a contract which violated a federal regulation. *Bradley v. Minor*, 245 P.2d 1206 (Kan. 1952). In *Bradley*, the plaintiff entered negotiations to purchase a farm from the defendant for $10,320. *Bradley*, 245 P.2d at 1206. The plaintiff borrowed the full purchase price from an agency of the federal government. *Id.* at 1206. The defendant-seller realized the contract required the purchase of title insurance, costing $60, and the defendant refused to sign the contract. *Id.* at 1207. Another agreement was drafted under which the purchase price of the farm was increased to $10,380, with the understanding that the additional $60 would be used to pay for title insurance. *Id.*

4

A federal regulation prohibited any side agreements between buyers and sellers upon a purchase price greater or less than the true purchase price of the property. *Id.* at 1207. The defendant refused to carry out the agreement, and the plaintiff filed a lawsuit seeking specific performance of the contract. *Id.* at 1207-08. The Kansas Supreme Court held that the negotiations constituted a side agreement prohibited by law. *Id.* at 1208. The court held that the contract was in "direct contravention of law and unenforceable . . ." and recognized that no action can be maintained upon a contract or agreement made in violation of law. *Id.*

Prior Tennessee cases have established the principle that an action will not be maintained in a court of law to enforce an illegal contract. *See Whitley v. White*, 140 S.W.2d 157, 161 (Tenn. 1940); *Reaves Lumber Co. v. Cain-Hurley*, 152 Tenn. 339, 279 S.W. 257, 258 (1926); *Eastern Prods. Corp. v. Tennessee Coal, Iron & R.R Co.*, 151 Tenn. 239, 269 S.W. 4, 8-9 (1925); *Freeman v. Thompson*, 600 S.W.2d 234, 236 (Tenn. App. 1979); *Herbert v. Bush & Co.*, 298 S.W.2d 747, 752 (Tenn. App. 1956); *Easterly v. Myers*, 148 S.W.2d 640, 643 (Tenn. App. 1940).

Linda McDade and Grooms assert that the record does not indicate that the federal regulations were in effect at the time the parties entered into the agreement. However, the FCC adopted a notice of proposed rule-making on October 16, 1986, which stated the proposed rule that partial settlements among non-wireline applicants were prohibited. 1 F.C.C. Rcd 499. On this date, the parties were placed on notice of the intended action of the F.C.C. The record is unclear as to the date on which the agreement among the parties was made. However, Ivey testified that he first became aware of the FCC lottery in 1987. This is subsequent to the date in 1986 on which the notification of the proposed rule was published by the FCC. Moreover, the parties continued the agreement after the proposed amendment prohibiting partial settlements was adopted in 1988.

The partial settlement agreement among the parties in this case clearly violates FCC rules. On this basis, we conclude that the agreement is unenforceable. This holding pretermits the issue of whether the FCC's procedure for granting licenses for cellular operations constitutes a lottery which violates Article 11, Section 5 of the Tennessee Constitution, and we do not address that issue. Therefore, the trial court's grant of summary judgment in favor of Ivey is affirmed.

The decision of the trial court is affirmed.  Costs on appeal are taxed to the Appellant, for which execution may issue if necessary.

_____
                                        **HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**