No. 88,120

VARNEY BUSINESS SERVICES, INC., *Appellee*, v. HARLEY W. POTTROFF, *Appellant*.

59 P.3d 1003

22

*C. Brooks Wood,* of Morrison & Hecker, L.L.P., of Kansas City, Missouri, argued the cause, and *Erik P. Klinkenborg,* of the same firm, and *Joseph H. Cassell,* of Cassell & Lower, LLC, of Wichita, were with him on the brief for appellant.

*William L. Frost,* of Morrison, Frost and Olsen, LLP, of Manhattan, argued the cause, and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Harley W. Pottroff appeals the district court's grant of summary judgment in favor of Varney Business Services, Inc. (Varney), a corporation into which Varney & Associates, P.A. (Varney & Associates), a professional association, of which Pottroff was a previous officer and shareholder, had merged. In granting summary judgment, the district court found that the corporation had standing and was the real party in interest to bring the action. The action was based on an employment agreement that obligated signatories to pay a percentage of fees earned for services provided to former clients during the 5 years subsequent to terminating their relationship with the association. The district court interpreted and enforced the terms of the employment agreement and granted a money judgment to the corporation. On appeal, defendant claims (1) the corporation was not a real party in interest and did not have standing to assert a claim, (2) the corporation was not a party to the employment agreement, and the employment agreement was not supported by consideration; (3) the district court failed to evaluate the reasonableness of the employment agreement; (4) the employment agreement is contrary to public policy and illegal; (5) the employment agreement terminated and released the defendant from liability; (6) the district court erred in calculating the fees due under the employment agreement; and (7) the district court erred in awarding prejudgment interest.

The professional accounting firm of Varney & Associates, P.A., formerly Varney, Mills, Rogers, Burnett & Associates, P.A., was formed in 1977. On July 1, 1988, an officers' employment agree-

ment (Employment Agreement or Agreement) was entered into by the 10 shareholders of the firm. Appellee Harley W. Pottroff was an officer/shareholder of the firm at the time. Article X of the Employment Agreement was entitled "AGREEMENT NOT TO COMPETE." It provided that all parties to the agreement, upon leaving the firm, could not, directly or indirectly, engage in the practice of public accounting or computer services in the city of Manhattan, Kansas, all other cities in which the firm maintained an official office, or within a 35-mile radius of such areas for a period of 5 years.

Pottroff was elected to serve as Chairman of the Board and Chief Executive Officer (CEO) of Varney & Associates in June 1994. At the July 1994 meeting of Varney & Associates' Board of Directors it was determined that revisions to the Employment Agreement were necessary. Pottroff was responsible for circulating suggested changes to the Employment Agreement. The Board of Directors unanimously approved the revisions to the Employment Agreement at its December 1994 meeting. All 10 shareholders signed the revised Employment Agreement. Article X of the 1988 version of the Employment Agreement effectively became Article IX of the revised agreement and retained the title of "AGREEMENT NOT TO COMPETE." The article was amended to provide that all parties to the agreement that left the firm for any reason were obligated to compensate the firm for the firm's clients that they provided services to over the subsequent 5 years. Compensation to the firm was to be determined by a declining percentage schedule applied to fees earned.

In an agreement dated May 8, 1996, Joseph Mills resigned as an officer/shareholder of Varney & Associates. In addition to setting forth the amount Varney & Associates would compensate Mills for his shares of Varney & Associates under the Employment Agreement, the agreement also provided that Mills agreed to abide by Article IX of the Employment Agreement as modified, set forth the percentages of fees Mills would pay, and noted that the fees earned by Mills in the performance of personal financial planning services were exempt from inclusion in the calculation of compensation owed. All 10 shareholders signed the agreement.

At the June 18, 1996, meeting of the Board of Directors of Varney & Associates, the shareholders voted to approve additional modifications to the Employment Agreement. Pottroff was still acting CEO of Varney & Associates at the time. The approved modifications to Article IX stated:

"AGREEMENT NOT TO COMPETE

"It is understood and agreed that anyone who is allowed to be associated with this firm learns the business secrets of the clients of the firm as well as those of the firm itself. It is, therefore, normal and prudent that the firm acquire agreements from all employees restricting their activities after parting from the firm. Therefore, all parties to this agreement agree and promise that if they leave the firm, terminate or are terminated, retire, for any reason, they will compensate the firm for the firm's clients they provide service to for the subsequent five (5) years. The firm's clients are defined as any client the firm provided service *to or for in the year of or the year preceding the termination of the stockholder/officer*. The amount of the compensation paid to the firm will be the scheduled percentage of the fees earned from the client by the terminated officer/shareholder. These amounts will be remitted to the firm *not later than 60 days after the end of each year of the five year period subsequent to the officer's date of termination or resignation. The firm has the right to audit the records of the terminated officers/shareholders*.

> Year 1-35%
> Year 2-25%
> Year 3-15%
> Year 4-10%
> Year 5-10%." (Emphasis added to show modifications from 1994 version.)

The modified Employment Agreement was signed by eight of the nine remaining shareholders. L. Gary Boomer did not sign.

In an agreement dated December 31, 1996, L. Gary Boomer resigned as an officer/shareholder of Varney & Associates. The agreement acknowledged the "non-competition agreement" that was in existence and provided that Boomer would pay Varney & Associates a declining percentage of all fees earned, net of client reimbursed expenses, from Varney & Associates' clients over the next 5-year period. The declining percentage schedule was the same as that set forth in Article IX of the Employment Agreement. Client reimbursed expenses were defined as "direct travel, supplies, hardware and software associated with the delivery of client

service." A list of Varney & Associates' clients was attached to the agreement. The agreement also provided that Varney & Associates had the right to review records of receipts and collections during this 5-year period. Unlike under the Employment Agreement, however, payment was to be made within 30 days after the close of the calendar year. The agreement was signed by Pottroff, for Varney & Associates, and L. Gary Boomer.

A supplemental termination agreement was subsequently entered into between Varney & Associates and L. Gary Boomer. The supplemental agreement provided that upon closing of a contract between L. Gary Boomer and Practitioners Publishing Company (Practitioners), Boomer would pay a lump sum of $300,000 to Varney & Associates rather than the declining percentage of fees earned over the next 5 years. The supplemental agreement was to be null and void if the contract was not closed by June 15, 1997. The supplemental agreement was signed by Pottroff, for Varney & Associates, and L. Gary Boomer.

On March 3, 1998, Pottroff entered into an agreement with Varney & Associates. The agreement noted that Pottroff had resigned as an officer and director of Varney & Associates effective August 31, 1997, and that Pottroff was to receive $108,734.17 for his 340 shares of Varney & Associates' stock. The agreement allowed Pottroff to surrender his shares of stock and absolve himself of future liability. The agreement also provided that Varney & Associates' right to recover any sums due pursuant to other agreements with Pottroff was not prejudiced.

On June 17, 1998, Century Business Services, Inc. (Century), a Delaware corporation, B.A. Acquisition Corp. (BA), an Ohio corporation, and the six remaining shareholders of Varney & Associates, entered into an "Agreement and Plan of Merger" (Merger Agreement). Pursuant to the Merger Agreement, Varney & Associates and its shareholders agreed to convert Varney & Associates from a professional association into a business corporation. The Merger Agreement further provided for Varney & Associates to merge into BA and for Varney & Associates to cease to exist. In completing the merger, BA was to change its name to Varney Business Services, Inc., an Ohio corporation.

The Merger Agreement provided that each officer of Varney & Associates would become an initial officer of Varney. The merger was contingent upon each shareholder entering into an employment agreement with Varney and upon Varney & Associates, CPA's, LLC (Varney CPA's), entering into an administrative services agreement (Services Agreement) with Varney. Varney CPA's was created immediately following the merger and was comprised of certified public accountants (CPAs) who were employees of Varney and Varney CPA's. Under the Services Agreement, Varney received 85 percent of Varney CPA's gross revenues as payment for services provided to Varney CPA's in the form of office space, equipment support staff, professional staff, and administrative staff. The Services Agreement was approved by the Kansas Board of Accountancy.

After this action was filed, Varney, pursuant to an asset purchase agreement, transferred this claim and the judgment to Varney CPA's. Appellee's motion to substitute Varney CPA's for the appellee was granted; however, the caption of the case remained the same for purpose of the pleadings. Thus, the present holder of the claim in this case appears to be the same entity that entered into the Services Agreement with Varney as a condition of the merger.

On June 16, 1999, Varney filed a petition in Riley County District Court alleging that Pottroff breached the Employment Agreement by failing to pay compensation as required by Article IX of the Agreement. After numerous pretrial motions, including motions for summary judgment and partial summary judgment by both parties, the district court granted summary judgment for Varney, finding: (1) Varney was a real party in interest and had standing; (2) Article IX of the Employment Agreement was enforceable; (3) the reasonableness of the Employment Agreement was not an issue in the case because Varney was not attempting to enforce a covenant not to compete; and (4) Varney was entitled to judgment for $383,999.43.

Pottroff filed a notice of appeal. This court has jurisdiction by transfer on its motion pursuant to K.S.A. 20-3018(c).

## Real Party in Interest and Standing

Pottroff asserts that Varney, the surviving corporation of the merger, is not the real party in interest and did not have standing.

Alternatively, Pottroff asserts that the deposition testimony of Michael Rogers, the CEO of Varney and former shareholder of Varney & Associates, raises a genuine issue of fact as to this issue. Varney contends, however, that it is the real party in interest and has standing.

The standard for granting and reviewing the grant of summary judgment is well established.

" 'Summary judgment is appropriate when the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. (Citation omitted.)' " *Arctic Financial Corp. v. OTR Express., Inc.*, 272 Kan. 1326, 1331, 38 P.3d 701 (2002) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

It is important to first note the evidence before the district court when summary judgment was granted. At that time, Rogers' deposition testimony was that, as president and CEO of Varney & Associates and as lead person responsible for negotiating the merger, the intent of Varney & Associates was to transfer all assets, which included the claim against Pottroff that arose out of the Employment Agreement, to the surviving entity of the merger. Additionally, section 3.2.20 of the Merger Agreement, entitled "Contracts and Agreements," required Varney & Associates and its stockholders to list all agreements to which Varney & Associates was a party on Schedule 3.2.20. Schedule 3.2.20 listed, among other things, the following: (1) the agreements between Varney & Associates and Pottroff dated March 3, 1998, and December 31, 1996; (2) the termination of the supplemental termination agreement between Varney & Associates and L. Gary Boomer; and (3) the May 5, 1996, agreement with Joseph Mills. None of these agreements were assigned a value on the schedule. As a result of

the merger, each of the six shareholders of Varney & Associates received Century stock valued at $640,000 in exchange for their 347 shares.

In granting partial summary judgment to Varney on this issue, the district court found that Varney was a real party in interest and had standing. In reaching this conclusion, the district court relied upon the fact that Varney became vested with all the property and causes of action previously held by Varney & Associates pursuant to K.S.A. 17-6709.

Pottroff subsequently filed a motion for relief from judgment, which asserted that new evidence warranted the setting aside of the prior order of partial summary judgment. The new evidence was a contradictory deposition statement by Michael Rogers. At a subsequent deposition, Rogers testified that he and the other former shareholders of Varney & Associates had an interest in the amount of money recovered from Pottroff and that there was an agreement with Century that the money recovered from Pottroff was the "property of the original owners" of Varney & Associates. Minutes later, Rogers testified that the original shareholders of Varney & Associates did not have a direct financial interest in payments made by Pottroff and that he did not believe that there was any agreement between the former shareholders of Varney & Associates and Century as to the disposition of this money. The deposition continued:

"Q. [Defense counsel]: So then you are telling me that any such payment will come into [Varney] simply as income and be treated the same as any other income to that company?

"A. [Rogers]: Have to be.

"Q.: Well, it wouldn't have to be if there was an understanding to the contrary. And that's my question, is there an understanding to the contrary?

"MR. FROST [Plaintiff's counsel]: Well—go ahead.

"Q.: Sir?

"A.: There's no written agreement.

"Q.: Well, what's the oral understanding?

"A.: When we merged with Century we had to deliver five hundred thousand dollars of hard assets. Anything above that was to come to us. They would not value that asset as part of the five hundred—we put up five hundred thousand and then—so that is an asset that is still of the Varney Business Services, but whether I have a direct interest or not, I don't know.

"Q.: Well, it's going to come back to you because they didn't count it—you provided five hundred thousand, you and the others—

"A.: But—

"Q.: —right?

"A.: Yes, I hope so.

"Q.: You're anticipating it will come back to you and the other shareholders?

"A.: Yes."

Varney responded to Pottroff's motion for relief from judgment by asserting that, when taken as a whole, Roger's testimony was consistent with the prior evidence in establishing that Varney had standing and was a real party in interest. Additionally, Varney contended that the district court did not have the statutory authority to amend its order granting summary judgment on this issue. We disagree with this contention.

The partial summary judgment in favor of Varney was not a final judgment; thus the subsequent discovery of this evidence did not preclude the district court from considering the evidence in rendering final judgment in the case. See K.S.A. 60-2102; *American Trust Administrators, Inc. v. Sebelius*, 267 Kan. 480, 486, 981 P.2d 248 (1999); *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 1, 836 P.2d 1128 (1992) (a final decision is one that finally decides and disposes of entire merits of controversy and reserves no further questions or directions for future or further action of a court).

In denying Pottroff's motion for relief from judgment, the district court continued to rely upon K.S.A. 17-6709 to support its finding that Varney had standing and was a real party in interest.

K.S.A. 17-6709(a) provides in pertinent part:

"When any merger or consolidation shall have become effective under this act, for all purposes of the laws of this state the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into one of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of such constituent corporations on whatever account, as well for stock subscriptions as all other things in action

or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations, and the title to any real estate vested by deed or otherwise, under the laws of this state, in any of such constituent corporations, shall not revert or be in any way impaired by reason of this act; but all rights of creditors and all liens upon any property of any of such constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to such surviving or resulting corporation, and may be enforced against it to the same extent as if such debts, liabilities and duties had been incurred or contracted by it."

Standing is a question of whether the plaintiff has alleged such a personal stake in the outcome of a controversy as to warrant the invocation of jurisdiction and justify exercise of the court's remedial powers on his or her behalf. Standing to sue means that a party has a sufficient stake in an otherwise justiciable controversy as to obtain judicial resolution of that controversy. *312 Education Assoc. v. U.S.D. No. 312,* 273 Kan. 875, 883, 47 P.3d 383 (2002); *Harrison v. Long,* 241 Kan. 174, 176, 734 P.2d 1155 (1987).

Pursuant to K.S.A. 17-6709(a), any right of Varney & Associates to make a claim against Pottroff for money due under the Employment Agreement was vested in Varney upon the merger becoming effective. See *Equifax Services, Inc. v. Hitz,* 905 F.2d 1355, 1361 (10th Cir. 1990) (where Kansas law was applied regarding covenant not to compete, court recognized in case of merger that surviving corporation automatically succeeds to rights of merged corporations to enforce employees' covenants not to compete).

Pursuant to K.S.A. 60-217(a), actions shall be brought by the real party in interest. This court has recognized with favor the following statement in 3A Moore's Federal Practice § 17.02 (2d ed. 1970):

" 'The meaning and object of the real party in interest provision would be more accurately expressed if it read: An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced.' " *Torkelson v. Bank of Horton,* 208 Kan. 267, 270, 491 P.2d 954 (1971).

See also *Bank of Kansas v. Davison,* 253 Kan. 780, 783, 861 P.2d 806 (1993); *Ryder v. Farmland Mut. Ins. Co.,* 248 Kan. 352, 366, 807 P.2d 109 (1991).

Varney is a real party in interest and has standing to sue because Varney & Associates' right to seek payment of money due under the Employment Agreement vested in Varney by operation of law at the time of merger. See K.S.A. 17-6709(a). Thus, any reference in Roger's deposition testimony to the contrary is irrelevant. *Cf. Limestone Farms, Inc. v. Deere & Company*, 29 Kan. App. 2d 609, 614, 29 P.3d 457 (2001).

### Party to and Consideration for the Employment Agreement

Pottroff contends the district court's finding that Varney & Associates was a party to the Employment Agreement was erroneous. Furthermore, Pottroff asserts that the Employment Agreement failed for want of consideration because all nine shareholders did not sign the 1996 version of the Employment Agreement.

The 1996 version of the Employment Agreement provided:

"This agreement made and first entered into at Manhattan, Kansas, July 1, 1988, (as modified December 14, 1994) is now being modified as of June 18, 1996. It shall be effective and binding on each entity signing the Certificate of Agreement, Appendix I, as of the date the signature is affixed thereon."

Pottroff notes that the 1996 version of the Employment Agreement did not provide a signature line for Varney & Associates and that L. Gary Boomer, an officer/shareholder, did not sign the 1996 version of the Agreement.

The district court made the following findings regarding this issue:

"9. The 1996 [Employment Agreement] was signed by all members of the firm except L. Gary Boomer. By affixing their signatures, all of the stockholders bound Varney & Associates [] to the agreement. The fact that L. Gary Boomer failed to sign is of no moment because Kansas law provides that a majority vote of stockholders binds a corporation.

"10. The 1996 [Employment Agreement] contained the same percentage payment scheme as the 1994 [Employment Agreement].

"11. [Pottroff] became a party to the 1996 [Employment Agreement] by virtue of his signature thereon."

The 1988 Employment Agreement was signed by all shareholders of Varney & Associates and by the firm through the signatures of its manager and secretary. The 1996 Employment Agreement

was a continuation of the original 1988 Employment Agreement. Pottroff, as CEO of Varney & Associates, signed agreements with Joseph Mills and L. Gary Boomer, referencing this same Employment Agreement.

Furthermore, Pottroff's agreement with Varney & Associates upon his resignation and surrender of his shares of the association complied with the terms of the Employment Agreement in valuing the shares surrendered. Pottroff also testified in his deposition that the shareholders of Varney & Associates assumed the Employment Agreement required Varney & Associates to pay leaving shareholders for their shares as provided in the Agreement. Most importantly, however, we note that the 1996 modification to the Employment Agreement was approved by all shareholders of Varney & Associates at the June 18, 1996, Board of Directors' meeting. The approval of the shareholders, as indicated by the minutes of the meeting, binds the action of the association.

As for whether the Employment Agreement fails for want of consideration, it must be noted that the district court did not address this issue specifically. Most likely, as Pottroff maintains, this was the result of the district court finding Varney & Associates to be a party to the Employment Agreement.

A contract must be supported by consideration in order to be enforceable. *State ex rel. Ludwick v. Bryant*, 237 Kan. 47, 50, 697 P.2d 858 (1985); *Mitchell v. Miller*, 27 Kan. App. 2d 666, 672, 8 P.3d 26 (2000). "Consideration is defined as some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." 17A Am. Jur. 2d, Contracts § 113, p. 129. A promise is without consideration when the promise is given by one party to another without anything being bargained for and given in exchange for it. 2 Corbin on Contracts § 5.20 (rev. ed. 1995).

The Employment Agreement specifically provided that the Agreement was binding, as of the date of signing, upon each entity that signed the Certificate of Agreement. Pottroff signed the Certificate of Agreement. L. Gary Boomer did not sign the Certificate of Agreement. The Employment Agreement's effectiveness was not conditioned on all shareholders signing the Agreement.

Pottroff recognizes that the Employment Agreement did not explicitly provide that all shareholders were required to sign the Agreement before it became binding. He contends, however, that there is a "strong inference under the circumstances" that this was a requirement for the Agreement to be enforceable. Although this interpretation may appear reasonable, the contract did not state such a requirement. As a party to the Agreement, Varney & Associates was the party to which each shareholder bound himself or herself, not to the other shareholders. If the signing shareholder was to terminate his or her employment with Varney & Associates and proceed to provide service to Varney & Associates' former clients, Varney & Associates could seek to recover from the shareholder under the Employment Agreement. Varney & Associates was also the party obligated under the Employment Agreement to compensate the resigning shareholder for his or her shares of the association. Thus, the Employment Agreement was supported by consideration, and Boomer's failure to sign the Certificate of Agreement did not affect the validity of the agreement between Varney & Associates and Pottroff.

We note that Article IX of the 1994 version of the Agreement is nearly identical to the 1996 version. As pointed out by Varney in its brief, even if the 1996 version of the Employment Agreement was invalid because it lacked one shareholder's signature, the 1994 version of the Agreement, signed by all shareholders, would be valid and binding upon Pottroff.

The district court did not err in finding Varney & Associates was a party to the Employment Agreement or in finding that the Employment Agreement did not fail for want of consideration.

## Reasonableness of Employment Agreement

The district court held that Article IX of the Employment Agreement was not a covenant not to compete and that, therefore, the "reasonableness" of Article IX was not an issue. Pottroff asserts the district court erred in failing to evaluate the reasonableness of Article IX of the Employment Agreement because Article IX was a restraint of trade and an unenforceable penalty.

Kansas courts have repeatedly recognized that covenants not to compete are valid if ancillary to any lawful contract, reasonable, and not adverse to the public welfare. *Weber v. Tillman*, 259 Kan. 457, 462, 913 P.2d 84 (1996); *Eastern Distributing Co., Inc. v. Flynn*, 222 Kan. 666, 670, 567 P.2d 1371 (1977); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 543-44, 493 P.2d 205 (1972); *Puritan-Bennett, Corp. v. Richter*, 8 Kan. App. 2d 311, 313, 657 P.2d 589 (1983). Freedom of contract is the driving force behind finding such covenants enforceable. *Weber*, 259 Kan. at 462.

The *Weber* court set forth four factors to be considered in determining whether a covenant not to compete is reasonable: "(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable?" 259 Kan. 457, Syl. ¶ 5; see *Weber*, 259 Kan. at 462 (only legitimate business interest may be protected by noncompetition covenant; covenant will be found unreasonable and unenforceable if sole purpose is to avoid ordinary competition); *Evco Distributing, Inc. v. Brandau*, 6 Kan. App. 2d 53, 58, 626 P.2d 1192, *rev. denied* 230 Kan. 817 (1981).

Article IX of the Employment Agreement is not a traditional covenant not to compete. The provision does not prohibit shareholders that terminate their relationship with Varney & Associates from providing services to former clients or from providing services within a set geographical area as a traditional noncompetition covenant would provide. Instead, Article IX states a declining percentage payment schedule that the former shareholder must comply with if he or she provides services to former clients of Varney & Associates.

Because of this difference, Varney relies upon *Francis v. Schlotfeldt*, 10 Kan. App. 2d 517, 704 P.2d 381 (1985), to support its argument that the district court did not err in finding that Article IX was not a covenant not to compete and that, therefore, the reasonableness of the provision need not be evaluated by the court. In *Francis*, the remaining partners in an accounting partnership sought to enforce a provision of the partnership agreement against

a withdrawing partner. As in this case, the provision did not prohibit a withdrawing partner from providing services to former clients of the partnership; rather, it required that the withdrawing partner compensate the remaining partners. The withdrawing partner was required to pay the remaining partners the business value of the client, which was established as being the greater of 50 percent of the preceding 36 months' billing, 150 percent of the total billings of the past 12 months, or 150 percent of an annualized fee of a new client not serviced for a complete year.

The *Francis* court found that the provision was not a covenant not to compete because it did not prohibit the withdrawing partner from practicing his profession within a certain time or place and placed no restrictions on the right of the withdrawing partner to accept work from former clients or actively solicit their business. 10 Kan. App. 2d at 518. The court recognized that it is the general policy of the law to permit mentally competent parties to arrange their own contracts and fashion their own remedies when no fraud or overreaching is practiced. Furthermore, it recognized that to balance the interests favoring freedom to contract and those opposing restraints of trade, it has been held that anticompetition covenants, ancillary to a contract of employment freely entered into with full knowledge, are valid and enforceable if the restraint is reasonable under the facts and circumstances of the particular case. 10 Kan. App. 2d 517, Syl. ¶¶ 1, 2. The *Francis* court held that, where there was no fraud or overreaching, the provision of the contract did not restrain trade and should be enforced without any further inquiry into fairness and reasonableness, in the same manner as any unambiguous contract. 10 Kan. App. 2d 517, Syl. ¶ 4, 520.

It does not appear that the reasonableness of this type of provision has been addressed by any other Kansas case. However, we note cases from other jurisdictions in which similar provisions have been found not to be restraints of trade and in which the reasonableness of the provision was not considered in finding them enforceable. See *J.W. Hunt & Co. v. Davis*, 313 S.C. 352, 356, 437 S.E.2d 557 (Ct. App. 1993); *Dixon, Odom & Co. v. Sledge*, 59 N.C.

App. 280, 284, 296 S.E.2d 512 (1982); *Isler v. Shuck*, 38 Or. App. 233, 238, 589 P.2d 1180 (1979).

In essence, Article IX and similar provisions in which former employees are required to compensate former employers for services provided to former clients serve the same purpose as covenants not to compete. In *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 317 N.W.2d 900 (1982), the Nebraska Supreme Court recognized that a distinction between the two types of provisions is artificial and meaningless. In *Salmen*, an accounting partnership agreement prohibited withdrawn partners from soliciting or performing services for former clients of the partnership. Upon breach of the covenant, withdrawn partners agreed to pay the partnership for the acquisition cost of such business in quarterly installments in an amount equal to the greater of the total amount of fees received from the client during 3 years preceding withdrawal or the total amount of fees received by the withdrawing partner from the client for the 3 years subsequent to withdrawal. The partnership asserted that the provision was not a covenant not to compete because it did not prohibit a withdrawn partner from entering the field of accounting, but merely obligated him to turn over fees that he earned. The *Salmen* court found this distinction to be artificial and meaningless because the effect of the provision was to prevent a withdrawn partner from earning income by competing with the partnership. Thus, the court applied a balancing test, as it would in evaluating a covenant not to compete, to determine whether the restraint on trade was reasonable. 211 Neb. at 128.

Several jurisdictions refer to provisions such as the one in this case as restrictive covenants and recognize that such covenants are enforceable only if reasonable. In *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381 (Tex. 1991), an accounting partnership agreement provided that any withdrawing partner that provided services to former clients of the partnership was responsible for compensating the partnership. The *Haass* court stated:

"The treatment of damages provisions similar to the one at issue has been addressed by the courts in a number of jurisdictions. Most courts have analyzed such provisions as restraints on trade sufficiently similar to covenants not to compete to be governed by the same general reasonableness principles in order to be

enforceable. Even those courts that have declined to treat such damages provisions as restraints on trade have required them to be reasonable to be enforced. The reasonableness tests adopted by the courts declining to treat such damages provisions as restraints on trade may generally be described as whether the restriction is greater than necessary to protect the business and goodwill of the employer, the economic hardship which the covenant imposes on the departing party, and whether the restriction adversely affects the interests of the public. Annotation, *Covenants To Reimburse Former Employer for Lost Business*, 52 A.L.R. 4th 139, 142 (1987). We regard these reasonableness tests as essentially indistinguishable from the ones applied to covenants in restraint of trade. We conclude that the view adopted by most courts, that such covenants should be subject to the same standards of reasonableness as covenants not to compete, is the correct one.

. . . .

Even when there is no express provision that the departing partner or employee is prohibited from competing, the conduct for which damages are assessed is competing by furnishing accounting services to clients of the former business. If the damages provided are sufficiently severe, then the economic penalty's deterrent effect functions as a covenant not to compete just as surely as if the agreement expressly stated that the departing member will not compete. The practical and economic reality of such a provision is that it inhibits competition virtually the same as a covenant not to compete." 818 S.W.2d at 385-86.

See *Foti v. Cook*, 220 Va. 800, 807, 263 S.E.2d 430 (1980) (accounting firm partnership agreement provided that for 2-year period following withdrawal the withdrawing partner would pay the partnership one third of fee collected from such clients in a 3-year period; covenant was found to be reasonable); see also *Dobbins, DeGuire & Tucker v. Rutherford, Etc.*, 218 Mont. 392, 397, 708 P.2d 577 (1985) (accounting employment agreement required terminated employees to compensate firm 100 percent of the gross fees billed by the firm to that client over the 12 months prior to termination if terminated employee services the same client within 12 months of termination; remanded case for determination of whether covenant was reasonable); *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 408, 362 N.W.2d 676 (1984) (employment agreement requiring terminated employee to pay employer for use of confidential information must be reasonable to be enforceable); Stroud, *Non-Compete Agreements: Weighing the Interests of Profession and Firm*, 53 Ala. L. Rev. 1023, 1031-34 (Spring 2002) ("In accounting firm partnership agreements, both direct and indirect

restrictions are judged by the reasonableness standard and are generally enforced by courts.").

Provisions such as Article IX are not immune to review for reasonableness. The same 4-factor test that applies to covenants not to compete applies to contracts to compensate a former employer. Absent fraud or overreaching, however, the contracts will be enforced according to their terms. Here, there is no evidence of fraud or overreaching. Thus, under the facts of this case, where the previous shareholder and officer of an association contracted to compensate the association upon terminating his relationship with the association with a percentage of the revenue received from providing services to former clients of the association, the contract is reasonable and should be enforced.

Pottroff also contends that this court should find that the application of the Article IX restraint beyond the merger was unreasonable as a matter of law because Varney did not have a legitimate competitive interest to protect after that point. Varney, under the Services Agreement with Varney CPA's, received 85% of Varney CPA's revenues. Varney CPA's engages in the public practice of accounting and provides "attest" services to clients. Based on the evidence in the record, Varney had a legitimate business interest that survived the merger through its contractual relationship with Varney CPA's. Thus, the restraint imposed by Article IX did not become unreasonable after the merger.

Finally, Pottroff asserts that the declining payment schedule set forth in Article IX is not a reasonable liquidated damages provision but rather an unenforceable penalty provision. We disagree. This is neither a liquidated damages provision nor a penalty provision. See *U.S.D. No. 315 v. DeWerff*, 6 Kan. App. 2d 77, 626 P.2d 1206 (1981) (a penalty is to secure performance while liquidated damages provision is for payment of sum in lieu of performance). Here, the parties agreed upon the value of Varney & Associates' clients. Thus, Article IX is no different than any other contract that provides for or states the value of an asset. See *Isler*, 38 Or. App. at 236 (analogized similar provision to purchase of customer list; formula for calculating payment due was not liquidated damages

clause or penalty clause, it was neither provision for payment in lieu of performance nor provision to secure performance).

## Contrary to Public Policy and Illegal

Pottroff contends Article IX of the Employment Agreement is contrary to the Kansas Board of Accountancy's Code of Professional Conduct and, therefore, the provision is void and unenforceable. The district court summarily denied Pottroff's motion for relief from judgment on this ground.

Contracts that are illegal or that violate public policy are void and unenforceable. See *Petty v. City of El Dorado*, 270 Kan. 847, 854, 19 P.3d 167 (2001); *Bradley v. Minor*, 173 Kan. 236, Syl. ¶ 1, 245 P.2d 1206 (1952). Interpretation of a statute is a question of law. *Unrau v. Kidron Bethal Retirement Services, Inc.*, 271 Kan. 743, 747, 27 P.3d 1 (2001). Whether a restrictive covenant is contrary to public policy is also a question of law. *Weber*, 259 Kan. 457, Syl. ¶ 1. This court has unlimited review over questions of law. See *Schmidt v. Kansas Bd. of Technical Professions*, 271 Kan. 206, 215, 21 P.3d 542 (2001).

Pursuant to K.S.A. 1-202(c), the Kansas State Board of Accountancy was granted the authority to adopt rules and regulations to govern the practice of certified public accountancy within the state. See K.A.R. 74-1 *et seq.* Administrative regulations have the force and effect of law. K.S.A. 77-425.

Pottroff contends Article IX violates K.A.R. 74-5-103 of the Kansas Code of Professional Conduct for certified public accountants, K.A.R. 74-5-1 *et seq.*, which provides in part: "A certified public accountant shall not pay a commission or offer any item of value to a third party to obtain a client." Pottroff asserts that Article IX's requirement that a departing shareholder pay part of the fees earned from Varney & Associates' former clients violates the regulation.

K.A.R. 74-5-103 does not apply to payments made pursuant to Article IX. The obvious intent of the regulation is to prevent accountants from paying out a commission or other item of value in return for referrals from third parties. In this case, the payment is not being made to obtain the client but as a result of taking an

asset away from the firm. Thus, Article IX does not violate K.A.R. 74-5-103.

We note that there is strong public policy in favor of recognizing provisions that compensate individuals and entities for the loss of a client's business as valid rather than in finding such provisions unenforceable. See *Engel v. Ernst*, 102 Nev. 390, 396, 724 P.2d 215 (1986) (provision requiring withdrawing partner in accounting firm to compensate firm if providing services to former clients protected legitimate business interest and was protective mechanism; professional practices must be allowed to protect the " 'fruits of their labor' ").

As to whether Article IX violates Kansas public policy, Pottroff puts forth no specific support for this contention in his brief. Points incidentally raised but not argued are deemed abandoned. *In the Matter of Rausch*, 272 Kan. 308, 32 P.3d 1181 (2001); *McKissick v. Frye*, 255 Kan. 566, 578, 876 P.2d 1371 (1994); see *McCoy v. Fleming*, 153 Kan. 780, Syl. ¶ 2, 113 P.2d 1074 (1941).

## Termination of Employment Agreement

Pottroff contends the district court erred in granting summary judgment to Varney because subsequent to the merger on June 17, 1998, there was no right to enforce the Agreement. Pottroff asserts that the merger terminated the Employment Agreement and that the Employment Agreement was conditioned upon the continuation of the firm.

The Employment Agreement contained the following provisions regarding its purpose and term:

"The purpose of this Agreement is to designate the general guidelines by which the various officers of Varney & Associates, PA (firm), will conduct themselves while employed by this firm of Certified Public Accountants engaging in those activities considered normal and customary for such business. . . .

"**ARTICLE I: TERM**
"This Agreement shall continue to be binding on the various parties whom shall agree to it from time to time during the course of its operation until it is terminated by law or by termination of their employment. If the Professional Association is terminated, the process of dissolution will be governed by the laws of the State of Kansas."

We note that at the time of the merger the shareholders of Varney & Associates entered into a new employment agreement with Varney that replaced the prior Employment Agreement. The Merger Agreement also provided that the shareholders were required to terminate "any redemption or stock purchase agreement" regarding Varney & Associates' shares. The Employment Agreement, in addition to containing the provision requiring compensation for providing services to former clients, required the valuation and surrender of Varney & Associates' stock.

Varney refutes Pottroff's claims regarding termination on the grounds that there was no sale, therefore, the Employment Agreement did not terminate. Varney relies upon K.S.A. 17-6709 to support this argument. K.S.A. 17-6709 vested the assets of Varney & Associates in Varney at the time of merger by operation of law. Article IX bound Pottroff prior to the merger. Under Article IX, Pottroff was obligated to compensate Varney & Associates for services he provided to former clients for the next 5 years. The subsequent termination of the original Employment Agreement, if any, had no effect upon Pottroff's obligation under Article IX.

## Calculating Fees

Pottroff asserts the district court erred in calculating the amount he owed Varney under the Employment Agreement.

Article IX defined a firm client of Varney's as being "any client the firm provided service to or for in the year of or the year preceding the termination of the stockholder/officer." The district court, in determining the amount Pottroff owed Varney, allowed the calculation to include clients of Varney & Associates to which Pottroff directly provided service, clients of Varney & Associates to which Pottroff Accountancy Corporation (PAC) provided service, and clients of Pottroff and PAC in which clients of Varney & Associates had an interest of as little as 20 percent. The district court noted in its decision:

"Here, the defendant left the firm. He immediately formed a corporation for which he and those in his employ provided accounting services to certain firm clients. He continues to do so. Some of those clients have formed or have become part of other legal entities, but they remain the same people they were when they

were clients of the firm. It cannot be rationally or reasonably argued that the signatories to the contract intended its terms to be avoided by the act of incorporation. Defendant is the sole shareholder in Pottroff Accountancy Corporation. It is his alter ego. The Court concludes the corporate veil should be pierced in order that defendant is held to his obligation under the contract."

Pottroff argues that Varney should not be allowed to recover for services rendered to entities in which clients of Varney & Associates merely owned interests because they are not within the definition of "firm clients" set forth in the Employment Agreement. He asserts that the new entities and businesses whose fees were included in determining the amount Pottroff owned Varney were not the same clients to which Varney & Associates had provided services to previously. Michael Rogers testified in his deposition that he had no evidence in support of, nor did he have the belief that, these new entities were formed to avoid Article IX.

When drawing the original Employment Agreement and the successor agreements, Pottroff could have defined a firm client more narrowly, thus limiting his obligation. It was not unreasonable for the district court to include as firm clients entities in which a client of Varney & Associates owned 20 percent interest. In the absence of specific limitation in the agreement, we agree with the district court.

Additionally, Pottroff takes issue with Varney being allowed to recover a percentage of the fees earned by Pottroff in performing "attestation" services because Varney is unable to provide such services. Pottroff contends because Varney cannot provide attestation services, Varney has no competitive interests in attestation clients. See K.S.A. 1-321(d) (defines "attest" services). The district court did not address this issue specifically.

The evidence indicates that attestation services were provided through Varney CPA's. The plain language of Article IX does not require that the same service be specifically performed by the party demanding payment. See *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 671, 876 P.2d 1362 (1994) (cardinal rule of contract construction requires courts to determine parties' intent from four corners of instrument by construing all provisions together; where

language of contract is clear and can be carried out as written, there is no room for construction or modification of terms).

Pottroff agreed to pay Varney & Associates a percentage of fees earned from Varney & Associates' clients. No limitation was placed upon which former clients and what services must be involved for the provision to be effective. Attestation services were performed by Pottroff because he was a CPA. Thus, Pottroff's argument is meritless.

## Prejudgment Interest

Pottroff contends the district court erred in granting Varney prejudgment interest. Pottroff asserts that in addition to the dispute over Varney's right to recover damages, there was also a dispute as to what amount, if any, Varney was entitled to recover. Specifically, Pottroff claims that there were disputes over whether Varney was entitled to recover a percentage of fees from clients that were not direct clients of Varney & Associates, whether Varney was entitled to recover a percentage of fees from attestation services, and whether Varney was entitled to recover a percentage of fees earned after the merger.

Varney argues that the district court correctly concluded that Varney's claim was liquidated and, thus, the award of prejudgment interest was not an abuse of discretion. Furthermore, Varney contends that the district court had discretion to award prejudgment interest even if the claim was not liquidated because Pottroff had the use of the money, Varney was deprived of the use of the money, and the award of prejudgment interest was necessary to award full compensation.

The award of prejudgment interest is governed by K.S.A. 16-201, which provides: "Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due."

"In Kansas, the general rule is that prejudgment interest is allowable on liquidated claims. *Miller v. Botwin*, 258 Kan. 108, 119, 899 P.2d 1004 (1995). 'A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical calculation.' *Hamilton v. State Farm Fire & Cas. Co.*,

263 Kan. 875, 883, 953 P.2d 1027 (1998). See *Miller*, 258 Kan. at 119; *Kilner v. State Farm Mut. Auto. Ins. Co.*, 252 Kan. 675, 686-87, 847 P.2d 1292 (1993). However, the fact that a good-faith controversy exists as to whether the party is liable for the money does not preclude a grant of prejudgment interest. *Miller*, 258 Kan. at 119 (citing *Crawford v. Prudential Ins. Co. of America*, 245 Kan. 724, 737, 783 P.2d 900 [1989])." *Blair Construction, Inc. v. McBeth*, 273 Kan. 679, 44 P.3d 1244 (2002).

The allowance of prejudgment interest is a matter of judicial discretion subject to reversal only upon a showing of abuse of discretion. *Bigs v. City of Wichita*, 271 Kan. 455, 480, 23 P.3d 855 (2001); *Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 241 Kan. 241, 247, 736 P.2d 882 (1987). Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *Bigs*, 271 Kan. at 478; *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 712, 722 (1999).

Pottroff had use of the fees collected for the entire time the fees were due under the Employment Agreement because the declining percentage for calculating the amount due was only applied to fees earned. Varney & Associates, and now Varney, was deprived of the use of these fees. Thus, the district court cannot be said to have abused its discretion in awarding prejudgment interest. See *Farmers State Bank v. Production Cred. Ass'n of St. Cloud*, 243 Kan. 87, 102, 755 P.2d 518 (1988).

Affirmed.

DAVIS, J., not participating.

Knudson, J., assigned.■